UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
STACIE SELFRIDGE,                       )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )
                                        )        13-CV-11108-DPW
MOHAMED JAMA, TRICIA MURRAY,            )
BAMBIE ANDERSTON, NOEMI PEREZ,          )
and BOSTON HOME HEALTH                  )
AIDES, LLC,                             )
                                        )
            Defendants.                 )
_____ )

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT ON ALL COUNTS OF PLAINTIFF'S COMPLAINT**

### I.     INTRODUCTION

The Plaintiff, a former employee of Boston Home Health Aides, LLC ("BHHA" or

"Company"), claims no fewer than 15 times in her Complaint to be an owner of the Company by

virtue of a certain employment agreement.  Plaintiff also claims that her employment agreement

entitled her to certain payments upon her separation from the Company. Yet, the Plaintiff's own

testimony in this case, as well as the controlling documents and law, have confirmed that Plaintiff

is not now, nor has she ever been, an owner of BHHA. Moreover, the payments to which

Selfridge now claims a right were and are purely discretionary. No one during Plaintiff's tenure as

an employee received any such payments for the simple reason that the nascent Company did not

have the funds.  As a matter of law none of Plaintiff's contentions is correct or sustainable. The

Defendants are, accordingly, entitled to summary judgment on all counts of the Plaintiff's

complaint. The Defendants bring to the Court's attention the fact that the Defendant Mohamed

Jama, the Company's CEO, was called to testify at deposition and invoked his 5th Amendment

privilege, and declined to provide any testimony. Given the record as set forth below, there is no indication that the basis for his having done so had anything whatsoever to do with the gravamen of Plaintiff's complaint. In any case, even if Plaintiff could conjure up some sort of adverse inference, such inference alone cannot, as a matter of law, meet the Plaintiff's burden of proof. *See e.g., C.O.* v. *M.M.*, 442 Mass. 648, 655 (2004). *See also Unum Group* v. *Benefit Partnership, Inc.*, 938 F. Supp.2d 177, 184 (D. Mass. 2013) ("…this much is clear: even when permitted at the summary judgment stage, an adverse inference, standing alone, is not sufficiently conclusive evidence to satisfy a moving party's burden"); *LaSalle Bank Lakeview* v. *Seguban*, 54 F.3d 387, 389 – 394 (7th Cir. 1995) (adverse inference is permissible from non-moving party's invocation of 5th Amendment on summary judgment, but only when invocation is supplemented by independent evidence of facts to which nonmovant refuses to answer.)  As shown below, the operable, unambiguous, and outcome-determinative documents speak for themselves, and the applicable law favors defendants. Furthermore, Selfridge's own testimony belies any notion of ownership or rights to Company funds.

## II.   MATERIAL FACTS SUPPORTING SUMMARY JUDGMENT

### a)   The Business of BHHA

BHHA is a visiting nurse/caregiver Company started in 2010. (See Ex. F, at paragraph 4.) Stacie Selfridge joined Boston Home Health Aides in late 2011, around the same time as the individual defendants, Murray, Anderson and Perez. (Selfridge Dep., pp. 38 -39, Ex. A.) At the time the Company had only 34 patients. (Selfridge Dep. p. 34, Ex. A.) Selfridge was a COTA or Certified Occupational Therapist Assistant. At BHHA, however, her primary responsibilities were administrative. (Selfridge Dep. pp. 80 - 81, Ex. A.)  Murray is an occupational therapist and Anderson a Registered Nurse. Perez does marketing for BHHA.

b)      **The Employment Agreement**

On or about February 1, 2012, Selfridge, Murray, Anderson and Perez signed the "Boston Home Health Aides, LLC Employment Agreement." (See Ex. B hereto, hereinafter "Employment Agreement.") The Employment Agreement expressly provided that none of the signatories could become members or owners of the LLC due to an on-going dispute with one of the original LLC members, Abdulkadir Mohamed. (Selfridge Dep. pp. 42 – 43, Ex. A.)

c.      **The Employment Agreement Did Not Confer Ownership Rights**

Specifically, the Employment Agreement states in pertinent part:

WHEREAS, pursuant to the Operating Agreement, the consent of all of the Members of the Company is required for the admission of additional Members;

WHEREAS, the Employees, while desiring to share in the profits and benefits of the Company, recognize and agree that, due to a pending dispute between the Company and one of the original Members, Abdulkadir Mohamed ("Abdul"), *no additional Members may be admitted until same is resolved either by agreement or judicial intervention[.]* (Ex. B.) (Emphasis added.)

The attorney who drafted the Employment Agreement for BHHA testified that these clauses were included because the signatories – including Selfridge – had discussed the fact that no new members could be added to the LLC (BHHA) due to an on-going owners' dispute. (See Deposition of Saul L. Benowitz dated June 13, 2014, pp. 57 – 59, Ex. C); (Selfridge Dep. pp. 46 – 47, Ex. A.) It was also understood and agreed by the signatories – prior to signing – that the salary and Incentive Pay referenced in the Employment Agreement did not convey any ownership rights. (Benowitz Depo., pp. 60 – 61, Ex. C); (Selfridge Dep. p. 44, Ex. A.) Tricia Murray confirmed that the third "whereas" clause was added because no new owners could be admitted to the Company while the dispute with Abdul Mohammed remained active. (Deposition of Tricia Murray dated June 11, 2014, at p. 16, Ex. D.) Paragraph II(e) of the Employment Agreement likewise provides:

e.      The Employees hereby acknowledge and agree that this Agreement provides for Employee compensation only, and *does not, nor is it intended to, create any membership or ownership interest in the Company* except as may otherwise exist under its Operating Agreement, and as the same may be modified, amended, or supplemented hereafter.

f.      This Agreement constitutes *the full and complete agreement of the parties hereto* with respect to the subject matter hereof. (Ex. B.) (Emphasis added.)

This section was included, "…just to make it abundantly clear that this agreement in and of itself did not create any ownership or membership interest in any of the employees…But this agreement, even as to them [the owners], only created payments in the form of employee compensation and didn't confer any ownership or membership rights in the company." (Benowitz Dep. pp. 60 – 61, Ex. C.) Selfridge never objected to any of this qualifying language. Nor did she ask that it be changed in any way. (Selfridge Dep. p. 59, Ex. A.)

### d.      The Contemporaneous Negotiations Disavowed Ownership

A contemporaneous email written by BHHA's counsel (who authored the Employment Agreement) and sent to Selfridge also makes clear the intent of the parties that the Employment Agreement bestow no ownership rights of any kind on any of the signatories:

My goal here, while trying to capture the "profit sharing" element you wish to implement, *is to avoid, to the greatest degree possible, the appearance and/or effect of creating an agreement which provides for ownership interests.*  I do not want to run afoul of the LLC statute, nor create a document – in the event litigation with Abdul becomes necessary – that would look like a subterfuge in order to distribute any monies to which he may claim he is entitled.  I believe that making payments in the nature of "compensation", as opposed to "profits", better reflects where we want to be.  It is obviously still somewhat problematic. (Emphasis added.)

(See Email from Saul Benowitz, Esquire, dated January 27, 2012, to Stacie Selfridge, Ex. E.) Moreover, the draft of the Employment Agreement was sent to Selfridge's counsel, one Brandon Ruggieri, for review on her behalf. (Selfridge Dep. pp. 48, 52 – 53, Ex. A.) Selfridge's counsel approved the draft. (Benowitz Dep., p. 63, Ex. C.)  Benowitz also drafted the Certificate of Organization and the Operating Agreement for the LLC, Boston Home Healthcare. (See Ex. F and

G, respectively.) Selfridge was never added as an additional member to either document. (Benowitz Dep., pp. 67 – 68, 70, 88, Ex. C.) The Operating Agreement called for the unanimous consent of all owners before any new members or owners could be added. (Benowitz Dep., p. 78, Ex. C.) No additional members were ever added to the LLC. (Benowitz Dep., pp. 68, 70, 88, Ex. C); (Selfridge Dep. pp. 61 – 63, Ex. A.) There was no agreement that Selfridge or any other employees would become "owners" automatically upon resolution of the issues with Abdul Mohammed. (Benowitz Dep. pp. 76 – 77, Ex. C.) Murray expected that to become owners the employees would have to go through legalities. (Murray Dep. p. 16, Ex. D.) The Employment Agreement also contains an express integration clause disavowing any oral agreements among the parties. (Benowitz Dep. p. 86, Ex. C); (Ex. B, Employment Agreement, paragraph 11 (f)). Murray and Anderson both have Facebook pages in which they describe themselves as BHHA "owners" for marketing purposes. (See Murray and Anderson Affidavits dated July 23rd, 2014, filed herewith.) Both of these representations are immaterial, however, as they are in the nature of "puffery," and cannot as a matter of law establish ownership rights. *Cf. NPS LLC* v. *Ambac Assurance Corporation*, 706 F.Supp.2d 162, 171 (D. Mass. 2010) (normal commercial puffing not actionable under Massachusetts law.)

### e.   The Payments Referenced Were Clearly Optional

The Employment Agreement states that certain "Incentive Payments" may be made "provided that, *in the judgment of the officers*, the financial condition of the company warrants the same." (Employment Agreement, Paragraph 2(b), Ex. B.) (Emphasis added.) Thus, these payments were purely discretionary, and never guaranteed. (Benowitz Dep., pp. 14, 70 – 71, 74, Ex. C.) The Employment Agreement also provided for a discretionary termination payment when the employee's employment with the company came to an end. The value of this payment, if any, was linked directly to the employee's Incentive Payments. Neither Selfridge nor any of the

individual defendants received Incentive Payments during Selfridge's tenure. (Selfridge Dep. pp.

68 – 70, Ex. A.); (Deposition of Lauren L. Anderson dated June 11, 2014, p. 23, Ex. H.) The

Company simply did not have the money to make any such payments. (Selfridge Dep. pp. 66, 69

– 71, Ex. A.) In fact, often the Company could not pay the full salaries of Selfridge and the other

employees, and overdue back-pay had to be recorded and paid when funds became available.

(Anderson Dep., p. 23, Ex. H); (Selfridge Dep. pp. 78 -79, Ex. A.) There were times when BHHA

payroll checks bounced due to insufficient funds. (Selfridge Dep. p. 78, Ex. A.)

     f.    **Selfridge was Justifiably Terminated by the Company's CEO**

     Selfridge was terminated in October 2012 after approximately 8 months with the

Company. (Selfridge Dep. pp 131 -132, Ex. A.) Selfridge was terminated for a variety of reasons,

including:

- "The final one was our Assistant Director of Nursing had come to us stating that Stacie had approached her and said, 'I'm going to [expletive deleted] everybody at Boston Home Health and bring it down,' to which Judy replied, 'Please don't do that.' And she said quote, 'Watch me.' That was the final day that they decided to let her go" (Murray Dep. p. 52, Ex. D); (Anderson Dep. p. 28, Ex. H);

- At best Selfridge worked maybe 10 hours per week. She spent three months of the eight with BHHA in an all-day clinical training for school, not at BHHA (Murray Dep. pp. 53, 56 - 59, Ex. D); (Selfridge Dep. pp. 141- 143, Ex. A);

- Selfridge did not get along with the other BHHA employees, its lawyer, or its landlord, and people left the Company because of her (Murray Dep. pp. 60-61, 65 – 66, Ex. D);

- Selfridge was insubordinate to BHHA's Chief Executive Officer (Murray Dep. p. 67, Ex. D);

- Selfridge claimed falsely that she knew patient referral sources, yet brought no new patients to the Company; in fact, she lost patients by not showing up at their homes (Murray Dep. p. 55, Ex. D);

- She was not qualified to do the tasks she claimed she had experience with (Murray Dep. p. 68, Ex. D).

(See also Anderson Dep., pp. 27 – 29, recounting many of the same reasons for Selfridge's termination, Ex. H.) Selfridge does not recall discussing her performance issues with anyone prior to her termination. (Selfridge Dep. pp. 135 – 136, Ex. A.)

g.      **Selfridge's Illicit Actions Cost the Company Dearly**

After her departure, BHHA learned that Selfridge had improperly billed Medicare/Medicaid for patient services she herself was not legally qualified to write-up or provide.  Murray attempted several times to make contact with the Occupational Therapist who worked closely with Selfridge. Murray wanted to ask the O.T. to confirm that the handwriting on the questionable records was that of the O.T.'s and not Selfridge's, as the law required. Murray received no response whatsoever. (Murray Dep. pp. 97 – 99, Ex. D.) As a result of these fraudulent billings, BHHA was required to pay Medicare/Medicaid back approximately $11,000. (Murray Dep. pp. 94 – 96, Ex. D.) BHHA routinely fires employees who falsify patient care records. (Murray Dep. p. 91, 97-98, Ex. D); (Anderson Dep. pp. 42 – 45, Ex. H). The Company also discovered that Selfridge – who did payroll for BHHA– was overpaying by twice the going rate, the Occupational Therapist who signed the medical records improperly filled out by Selfridge. (Murray Dep. pp. 69 -70, 98, 106 – 107, Ex. D); (Anderson Dep. pp. 42 – 45, Ex. H.) After her termination, Benowitz recalls Selfridge looking for approximately $10,000 in back pay and severance. (Benowitz Dep. p. 27, Ex. C.)

h.      **The Company Has Grown Substantially Since Selfridge's Departure**

Since Selfridge's departure, the Company has grown from fewer than 30 patients to well over 300. (Murray Dep. p. 31, Ex. D.) Revenues have increased by 20% per quarter. (Murray Dep. p. 31, Ex. D.) Contrary to Plaintiff's assertions in her Complaint, there are no plans to sell the Company. (Murray Dep., pp. 35 -36, Ex. D); (Anderson Dep., p. 16, Ex. H.) The large increases in pay realized by the individual Defendants Murray and Anderson, in particular, reflect

appropriately the tremendous efforts made by them to make the Company a success. (Murray

Dep. pp. 24 – 26, Ex. D, describing her 65 – 75 hour work weeks); (Anderson Dep. pp. 14, 17, 23

– 24, Ex. H, explaining that she received only $12,000 for 2011, and $92,000 for 2012.)

### III.   LEGAL ARGUMENTS FAVORING  SUMMARY JUDGMENT

#### The Summary Judgment Standard

The point of summary judgment is "to pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial." *Mesnick* v. *Gen. Elec. Co.*, 950 F.2d 816, 822 (1st

Cir. 1991). On summary judgment, "[f]actual disputes that are irrelevant or unnecessary will not

be counted." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant may

not rest upon "conclusory allegations, improbable inferences and unsupported speculation."

*Feliciano de la Cruz* v. *El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000).

*Compare Chongris* v. *Board of Appeals of the Town of Andover*, 811 F.2d 36, 37 (1st Cir. 1987)

("those 'facts' which have since been conclusively contradicted by plaintiff's concessions or

otherwise," need not be considered.) The Complaint references Plaintiff's alleged ownership

interest in the Company at least 15 times. It is clearly the gravamen of Plaintiff's action against

Defendants. Plaintiff has admitted, however, that neither the BHHA Employment Agreement nor

its Operating Agreement made her an owner of the Company. Moreover, Selfridge has no "lost

income," as any Incentive Payments (although never even referenced in her complaint) were

admittedly discretionary in nature, and meant to incentivize and reward on-going, positive

contributions to the business.

#### The Written Employment Agreement Governs the Outcome of this Case

"It is settled that interpretation of unambiguous language in a written contract is a question

of law for the Court…and if the words of a contract are plain and free from ambiguity, they must

be construed in accordance with their ordinary and usual sense." *Edwin R. Sage Company* v.

*Foley*, et al., 12 Mass App. Ct. 20, 28 (1981) (citation omitted).  *See also Daley* v. *J.F. White Contracting Company*, 347 Mass. 285, 288 (1964) ("[I]n this Commonwealth the construction of an unambiguous written contract [is] a pure question of law") (citation omitted). *See Kennedy Bros., Inc.* v. *Bird*, 287 Mass. 477, 483 (1934) ("[t]o the same end, the material circumstances attendant upon those executing the contract *and the main purpose intended to be accomplished may be proved.*  Previous negotiations may clarify the sense in which expressions were understood by the parties"); *Kobayashi* v. *Orion Ventures, Inc.* 42 Mass. App. Ct. 492, 496 (1997) ("[t]he parol evidence rule only bars the introduction of prior or contemporaneous written or oral arguments that contradict, vary or broaden an integrated writing.") *Reinach* v. *The Hanover Company*, 2009 WL 6506883 (D. Mass. 2009) (Saylor, J) (granting summary judgment in favor of employer on breach of contract claims where terms of employment agreement were clear and contract was fully integrated expression of parties' intent). "[A]n ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other."  *Lumbermen's Mut. Cas. Co.* v. *Officers Unlimited, Inc.*, 419 Mass. 462, 466 (1995).  "Nor does the mere existence of multiple dictionary definitions of a word, without more, suffice to create an ambiguity, for most words have multiple definitions.  A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." *Citation Insurance Company* v. *Gomez,* 426 Mass 379, 381 (1998).  The material writings at issue are clear and unambiguous in their qualifications and limitations.

### A.    The Ownership Claim is at Best Chimerical

The final form of the Employment Agreement makes it abundantly clear in several different places that the signatories – including Selfridge - were not becoming and could not become owners of BHHA. "Contract interpretation questions, under Massachusetts law, are ordinarily questions of law for a court."  *Reinach* v. *The Hanover Company*, 2009 WL 6506883

(D. Mass. 2009) (Saylor, J) at p. 9. The parol evidence rule "precludes evidence of earlier or contemporaneous discussions that would modify the provisions of a later integrated agreement which the proponent of the agreement seeks to enforce." *Id*., citing *Bank* v. *IBM*, 145 F.2d 420, 424 (1st Cir. 1998). The Employment Agreement contains an express integration clause: "This Agreement constitutes the full and complete agreement of the parties hereto with respect to the subject matter hereof." (See Employment Agreement, paragraph 11 (f), Ex. B). Selfridge admitted in her deposition that the Employment Agreement did not make her an owner or member of the Company:

> Q.    So is it fair to say then that this agreement, Boston Home Health Aides employment agreement, did not make you a member of Boston Home Health Aides?
>
> A.    Yes.
>
> Q.    It didn't make you an owner of the business?
>
> A.    No.

(Selfridge Dep.,  p. 57, Ex. A.) When asked specifically about Section 11(e), Selfridge responded as follows:

> Q.    If you would turn to page 5, paragraph 11E under Miscellaneous, it says, "The employees hereby acknowledge and agree that this agreement provides for employee compensation only, and does not, nor is it intended to, create any membership or ownership interest in the Company except as may otherwise exist under its Operating Agreement, and as the same may be modified, amended, or supplemented hereafter."
>
> Did you agree with that statement when you signed this agreement?
>
> A.    That's what the agreement says.
>
> Q.    But my question is, did you agree with that when you signed the agreement?
>
> A.    Yes.

(Selfridge Dep. p. 58, Ex. A.) Selfridge never told Benowitz or her attorney, Mr. Ruggieri, or anyone else, that she wanted the two "whereas clauses" and paragraph 11(e) changed because she believed she was becoming an BHHA owner when she signed the Employment Agreement. (Selfridge Dep. p. 59, Ex. A.) Moreover, in this case as in *Reinach*, "everything that transpired prior to the issuance of the formal offer were normal business discussions and negotiations that did not result in any kind of verbal agreements, much less an inconsistent agreement." *Id.* at p. 9. The Employment Agreement even provided a specific reason –acknowledged by Selfridge - as to why the addition of more owners to the Company was not possible, *i.e.*, the existence of an on-going legal dispute with one of the three actual BHHA owners. (Selfridge Dep. p. 42 - 43, Ex. A, and e-mail dated 1/15/12, from BHHA's attorney, Saul Benowitz, to Selfridge, Ex. I.)

The Operating Agreement for Boston Home Health Aides, dated January 4, 2010, makes clear that the original members or owners of the Company were: Mohamed A. Jama, Abdulkadir Mohamed, and Barlin Hassan – not Selfridge or any of the other individuals who signed the Employment Agreement. (Ex. G.)  The Operating Agreement also outlines the members or owners' powers *vis-à-vis* the Company's operations.  (See Article VII entitled "Management," Ex. G.)  Article VII of the Operating Agreement provides in pertinent part:

**7.1    Management Vested With Members**

The business and affairs of the Company shall be managed by the Members [.]

The Members shall have the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company including the power to… (f) engage employees and agents, define their respective duties, and establish their compensation or remuneration.

(See Article VII, Operating Agreement, Ex. G.)  The Operating Agreement also provides at Article IX for the admittance of new owners or members:

**9.1**      **Admission of Additional Members**

No Additional [sic] Members shall be admitted to the company *unless with the written consent of all Members.* (Emphasis added.)

(See Article 9, Ex. G.)  No additional members have ever been added to the Company.  Selfridge was fully aware of this provision of the BHHA Operating Agreement when she signed the Company's  Employment Agreement:

Q.    Did you look at the operating agreement before you signed this document [the Employment Agreement]?

A.    I don't recall what it says or if I saw it. *I believe I did.*

Q.    All right. It says, "The consent of all the members of the company," meaning Boston Home Health Aides, "is required for the admission of additional members." Do you see that?

A.    Yes.

Q.    Was that your understanding when you signed this document?

A.    Yes.

(Selfridge Dep., p. 55, Ex. A.) (Emphasis added.) Selfridge admitted she has never been a signatory to the BHHA Operating Agreement:

Q.    Is it fair to say, ma'am, that this operating agreement is the  agreement that's referenced in Exhibit 6 in the second "whereas" clause[of the Employment Agreement]?

A.    Yes.

Q.    Were you ever a signatory to this operating agreement?

A.    No. 7?

Q.    Yes.

A.    No.

(Selfridge Dep., p. 60, Ex. A.) When asked about Section 9 of the Operating Agreement expressly governing the "Admission of Additional Members," Selfridge testified:

Q.      If you would look at page 6, No. 9, paragraph 9.1, it's entitled Admission of Additional Members. Do you see that?

A.      I do.

Q.      Do you know whether the written consent of all members were [sic] ever obtained to make you or anyone else another member of this operating company?

A.      Not that I am aware of.

(Selfridge Dep., pp. 60 -61, Ex. A.) Selfridge has never seen any changes to the Operating

Agreement purporting to add new members. (Selfridge Dep. pp. 62 – 63, Ex. A.) The Limited

Liability Company Act, G.L. c. 156C, *et. seq*., requires that a person be admitted as a member

"*upon compliance with the operating agreement* or, if the operating agreement does not so

provide, when the person's admission is reflected in the records of the limited liability company."

G.L. c. 156C, §20(2). (Emphasis added.) Consistent with Selfridge's own testimony, there are no

records whatsoever reflecting that Selfridge was ever admitted as a member or owner of BHHA.

*See also* G.L. c. 156C, §9(a)(5)(i) (requiring at minimum "a description and statement of the

agreed value of the property or services contributed by each member and which each member has

agreed to contribute.") Selfridge never made any financial contributions to the Company, as did

the actual owners. (Selfridge Dep. p. 61, Ex. A.)

At best, Selfridge may claim there was an agreement to agree concerning her eventual

admittance as a member of BHHA.  "An agreement to reach an agreement is a contradiction in

terms and imposes no obligation on the parties thereto." *Rosenfield* v. *United States Trust Co.,*

290 Mass. 210, 217 (1985).  *See also Coggiano* v. *Marchegiano*, 327 Mass. 574, 580 (1951) ("an

agreement to enter into a contract which leaves the terms of that contract for future negotiation is

too indefinite to be enforced.")  Selfridge herself admitted in answer to Defendants' Interrogatory

No. 20:  "The parties did not execute a formal agreement as to ownership only because of one

member who had raised certain issues."  (See Plaintiff's Response No. 2 dated May 27, 2014, Ex.

J.)  Section 7.32(b) of G.L. c. 156D, the Business Corporation Act, requires that shareholder

agreements be in writing.  The note to Section 7.32(b) provides:

> The principal requirements are simply that the agreement be in writing and be
> approved or agreed to by all persons who are the Shareholders…. Although a
> writing signed by all the Shareholders is not required where the agreement is
> contained in articles of organization or by laws unanimously approved, it may be
> desirable to have all the shareholders actually sign the instrument in order to
> establish unequivocally their agreement.

G.L. c. 156D, § 7.32(b).  The Company has only an Operating Agreement signed by all its

members.  There are no Articles of Organization or by-laws *per se*.  Thus, the Operating

Agreement is the *de facto* shareholder agreement.  The Certificate of Organization dated January

4, 2010, does not contain Selfridge's name. (Ex. F.)

### B.    The Discretionary Incentive Payments and Termination Payment

Selfridge admitted that as of the date of her termination in October 2012, the Company

owed her only some back-pay and salary:

> Q.    Other than that, the 8,000, the 6,000, the 2,000 and 700, as of October 15,
>       2012, did the company owe you any other money?
>
> A.    No.

(Selfridge Dep., p. 91, Ex. A.) Selfridge described the $6,000 as back pay; the $8,000 as unpaid

hours worked, and the $2,000 as unpaid salary. (Selfridge Dep., pp. 88 – 90, 108, Ex. A.) The

Company did pay the $2,000 in unpaid salary and another $1,200 in severance. (Selfridge Dep.,

p. 91, Ex. A.) Selfridge never stated in her Complaint, at her deposition, or in her sworn answers

to interrogatories that she was owed a so-called "Termination Payment." In response to

Defendants' interrogatory on damages, Selfridge claimed she "lost income" of $350,000. When

asked about how she arrived at this figure, *Selfridge could not answer the question*:

> Q.    When you left the company, when you were terminated in October of
>       2012, what was your total gross income up to that point from BHHA?

A.      I would have to look at my W-2, but I believe the –I don't have an exact
        number – is that ok?

Q.      Yes, estimate it.

A.      67.

Q.      So we call it 70, call it 70?

A.      Yes.

Q.       Let's say from January 1st of 2013 to January 1st, 2014, that would be
        140,000, wouldn't it?

A.      Yes.

Q.      So how do you get to 350?

 [Objection by Selfridge's counsel]

A.       I can't answer.

Q.      You don't know?

A.      No.

(Selfridge Dep. p. 111, Ex. A.) Selfridge's testimony reveals that the "damages" figure is, at best,

illusory.

        The Employment Agreement makes clear on its face that the so called "Termination

Payment" is optional only.  "There is …the interpretive rule that all of the contract's terms should

be construed together to find a coherent whole…As such, a court may look to related provisions

of a contract to cast light on the meaning of disputed language."*Nadherny* v. *Roseland Prop. Co.*,

390 F.3d 44, 48 (1st Cir. 2004). The paragraph which deals with the Termination Payment is

qualified with the words, "[i]n the event the Company elects to make the Termination Payment

referred to in Section 5 and 6 above, …".  The word "elect" means "to choose," or "to decide."

See Oxford American Dictionary and Thesaurus, Oxford University Press, 2003, American

Heritage Dictionary, Third Edition, 1992.  Thus, any such payment was entirely discretionary.

This interpretation is further supported by the fact that the amount of any such Termination

Payment is based entirely upon a likewise discretionary "Incentive Payment." The Incentive

Payment "shall be made to the Employees, … provided that, in the judgment of the officers, the

financial condition of the Company warrants the same." (Ex. B, paragraph 2(b)). Benowitz

testified that the Termination Payment section did not make the Incentive Payments in any way

mandatory (Benowitz Dep. pp. 71 – 73, Ex. C.) Thus, the contract expressly contemplates that

Incentive Payments, if any, are dependent on the Company's ability to make them. During

Selfridge's nine month tenure, BHHA did not have any money to distribute as Incentive

Payments. (Selfridge Dep. pp. 69 -70, Ex. A.) Calculation of any "Termination Payment" was

likewise subject to the same condition precedent, as said payment is wholly dependent upon the

value of any Incentive Payments made previously – payments which did not exist as of

Selfridge's termination. "Ordinarily, ambiguities in contract language present questions of fact for

the jury …However, 'if, despite the ambiguity, no reasonable person could interpret the contract

as one party does, the court may enter judgment against that party.'" *Reinach*, 2009 WL 6506883

at p. 10, citing *Nadherny* v. *Roseland Prop. Co.*, 390 F.3d 44, 48 (1st Cir. 2004). As of Selfridge's

termination, the Company had made no Incentive Payments to any employees because it simply

could not afford to do so. Benowitz testified that the term "reasonable present fair market value

of the Employee's rights to receive Incentive Payments," means as of the time of the triggering

event – in Selfridge's case, when she was terminated in October 2012. It does not mean some

future undefined point of Plaintiff's choosing. This interpretation is borne out by Paragraph 8 of

the Employment Agreement which expressly provides that if the employee is terminated "without

'Adequate Cause'… Company shall be required to make the Termination Payment, in full, within

thirty (30) days after the effective date of termination." (Ex. B, Employment Agreement,

paragraph 8.) Selfridge testified unequivocally that as of the date of her termination the Company

owed her some back pay, a salary check and little else. (Selfridge Dep. p. 88, Ex. A.)

Even if one could interpret the Employment Agreement as mandating Incentive Payments,

given the financial circumstances of the nascent Company in 2012, calculating a "Termination

Payment" was simply not possible as of the date of Selfridge's discharge:

> [I]t is equally well settled that where from the nature of the contract it appears that
> the parties must from the beginning have contemplated the continued existence of
> some particular specified thing as the foundation of what was to be done, then, in
> the absence of any warranty that the thing shall exist, the contract is to be
> construed not as a positive contract, but as subject to an implied condition that the
> parties shall be excused in case before breach performance becomes impossible[.]

*Boston Plate and Window Glass Company* v. *John Bowen Co.*, 335 Mass. 697, 700 (1957)

(citation omitted.) *See also Chase Precast Corporation* v. *John J. Paonessa Company, Inc.*, 409

Mass. 371, 373 (1991) ("[t]his court has long recognized and applied the doctrine of impossibility

as a defense to an action for breach of contract.") Tellingly, the Complaint in this case never even

mentions the term "Termination Payment."  In paragraph  61 of Selfridge's Complaint there is

only a vague reference to "promised severance pay," but any such pay so styled is always

optional.

### C.    Selfridge's Employment was Expressly Subject to Termination

Section 1 of the Employment Agreement provides in pertinent part: "Any actions taken by

the Officers (*i.e.*, Mohamed Jama and Stacie Selfridge) shall be made by their mutual agreement

provided, however, that if they do not agree…the decision of Mohamed Jama …shall take

precedence[.]" (Employment Agreement, paragraph 1  entitled "Management of Company," Ex.

B.) One of the enumerated powers of the Officers is to "employ such…employees…necessary or

appropriate to carry out the business and affairs of the Company[.]" Section 6 of the Agreement

concerns circumstances where "an Employee's employment is terminated by the Company[.]" It

is well settled that "where an employment contract, be it express or implied, contains no definite

period of employment, it establishes employment at will." *Jackson* v. *Action for Boston Community Development, Inc.*, 403 Mass. 8, 9 (1988) ("[e]mployment at will is terminable by either the employee or the employer without notice, for almost any reason of for no reason at all.") Selfridge's interrogatory answers state she could not be terminated because she was "an owner." (See Ex. J, Answer No. 17 at page 6: "In addition, as an LLC member she could not be terminated." ) Clearly, the undisputed record shows Selfridge was not an owner or "member" at the time of her termination. When asked what part of the Employment Agreement provides that she could not be terminated, Selfridge pointed to Section 1, quoted above. (Selfridge Dep. pp. 102 -103, Ex. A.) The paragraph referenced by Selfridge contains no such provision, and no definite period of employment whatsoever. It does, however, permit the Company CEO to terminate Selfridge.

### D.   The Emotional Distress Claims Ring Hollow

Liability for intentional infliction of emotional distress holds only in rare circumstances not found here:

> Liability cannot be predicated on " 'mere insults, indignities, threats, annoyances, petty oppressions or other trivialities' nor even is it enough 'that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice" or a degree of aggravation which would entitled the plaintiff to punitive damages for another tort.'" *Foley* v. *Polaroid Corp.*, 400 Mass. 82, 99 (1987), quoting Restatement (Second) of Torts §46 comment d (1965).

*Tetrault* v. *Mahoney, Hawkes & Goldings*, 425 Mass. 456, 466 (1996). Plaintiff must demonstrate that "defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community," and "of such a nature that no reasonable person could be expected to endure it." *Payton* v. *Abbott Labs*, 386 Mass. 540, 555 (1982), citing *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 145 (1976). Selfridge has not made the requisite showing. When asked at her deposition whether she had entered into any formal

therapy to alleviate her purported emotional distress, Selfridge answered unequivocally, "No." (Selfridge Dep. pp. 115 – 116, Ex. A.) Selfridge was terminated for failure to perform the duties of her position, and for not working full-time, as expected. Even after she was gone, it became clear that she had violated her duty of loyalty to the corporation by grossly over-paying one of the people she supervised, and by violating Medicare/Medicaid reimbursable treatment billing rules. This last bit of malfeasance by Selfridge cost the company $10,000.

### E.   There is No Basis for the Defendants' Individual Liability

As a matter of law there is no personal liability for the BHHA employees Murray, Anderson, and Perez. By the express terms of the Employment Agreement, they are not now nor have they ever been officers of the Company. They had no fiduciary or other type of obligation to Selfridge. While they agreed that Selfridge had to go, it was Mohamed Jama – the CEO of the Company and its officer ultimately charged with making such a decision – who terminated Selfridge. (Sefridge Dep. pp. 84 – 85, Ex. A.) "The corporate veil should be lifted only 'in rare particular situations in order to prevent gross inequity.'" *Papasodero* v. *Thayer & Associates, Inc., et. al.*, 14 Mass.L.Rptr. 684, 2002 WL 1555319 (Mass. Super.) citing *My Bread Baking Company* v. *Cumberland Farms, Inc*., 353 Mass. 614 (1968). Plaintiff has failed to show, as is required, "the presence of 'an element of dubious manipulation, contrivance, and finagling, such that corporate identities are confused and third parties cannot be quite certain with what they are dealing.'" *Id*., citing *Evin* v. *Multicon Construction Corp*., 30 Mass. App. Ct. 728 (1991). There is also no basis for any personal liability concerning Mohamed Jama. As shown in section D, above, his action in terminating Selfridge was entirely justified, and expressly within his realm of officer's responsibilities as set forth in the Employment Agreement and Operating Agreement.

**F.**     **There is No Basis for a Claim Under The Fair Labor Standards Act**

Count VI of the Complaint alleges that "Defendants have failed to pay Ms. Selfridge

overtime wages exceeding $15,000," and that this failure constitutes a violation of 29 U.S.C.

§201, the Fair Labor Standards Act. Selfridge testified at least twice at her deposition that *the*

*Company did not pay overtime*. (Selfridge Dep. pp. 89, 108, Ex. A.) Selfridge did not classify as

"overtime" any of the monies she claims to have been owed at the time of her discharge.

Moreover, Selfridge clearly met the administrative exemption under the FLSA. *See e.g., DiBlasi*

v. *Liberty Mutual Group, Inc*., 2014 WL 1331056 (D. Mass.) (granting summary judgment for

employer where employee met administrative function exemption of Act.) Like the plaintiff in

*DiBlasi,* Selfridge exceeded the minimum weekly pay for the administrative exemption, and

her "primary duty [was] the performance of office or non-manual work directly related

to the management or general business operations of the employer[.]" *Id.* at p. 7. Selfridge did

payroll, met with doctors, kept employee records, collaborated with vendors, input data into the

Company computer system, and prepared meeting agendas, among other administrative tasks.

(Selfridge Dep. pp. 80 – 83, Ex. A.)

**G.**     **There Can be No Recovery Under the Massachusetts Wage Act**

At the time of Selfridge's discharge, she was making approximately $67,000 annually

with BHHA. (Selfridge Dep. p. 111, Ex. A.) In 2013, Selfridge made approximately $58,000,

between the various employers she had for that year, as well as unemployment insurance. (See

Selfridge Dep. pp. 117 – 121, 125 and 129, Ex. A.) Setting off the $10,000 loss she caused

BHHA, her 2013 earnings and the set-off would exceed any award for "back pay" she could hope

to recover in 2013.  *See e.g., Camara* v. *Attorney General,* 458 Mass. 756, 762 (2011)

(recognizing that valid setoffs under §150 of G.L. c. 149, the Wage Act, "involve some form of

due process through the court system[.]"). Likewise, Selfridge testified that in 2014 she is making

a salary of $75,000 annualized in her present job with Commonwealth Community Care, and has made $15,000 from her work at Tewksbury Hospital. (Selfridge Dep. pp. 122 – 123, Ex. A.) Again, these earnings well exceed the $67,000 she was making at BHHA. Therefore, even if Selfridge could make a case for liability under the Wage Act, her claim for damages falls far short of any recoverable amount.

### IV.   CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment on all of the Plaintiffs' claims should be allowed in its entirety.

Respectfully submitted

MOHAMMED JAMA, TRICIA MURRAY,
BAMBIE ANDERSON, NOEMI PEREZ, and
BOSTON HOME HEALTH AIDES, LLC
By their attorneys,
THE MCLANE LAW FIRM

Dated: July 29, 2014

/s/ Andrew P. Botti
Andrew P. Botti
BBO # 558755
300 TradeCenter, Suite 7000
Woburn, MA 01801
Tel. (781) 904-2700
Andrew.Botti@McLane.com

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants, in any, on July 29, 2014.

/s/ Andrew P. Botti
Andrew P. Botti