UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STACIE SELFRIDGE,

    Plaintiff,

-v-

MOHAMED JAMA, TRICIA MURRAY, BAMBIE ANDERSON, NOEMI PEREZ, and BOSTON HOME HEALTH AIDES, LLC,

    Defendants.

No. 1:13-cv-11108-DPW

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Defendants rely primarily on the facts and law set forth in their Memorandum in Support of Defendants' Motion for Summary Judgment as their opposition to Plaintiff's apparent cross-motion for summary judgment. Defendants make the following additional arguments in opposition to Plaintiff's motion for summary judgment, and in support of their own summary judgment motion.

1) **The Complaint Mentions Nothing About Unpaid "Incentive Payments" or Unpaid "Termination Payments," Claims Which are Purely Afterthoughts**

At page 7 of her Complaint, under the heading "Defendants Breached Employment Agreement," there is no mention of unpaid "Incentive Payments" or an unpaid "Termination Payment" as constituting a breach of the subject Employment Agreement. In fact, nowhere in plaintiff's 12 page Complaint is there even mention of or reference to the terms "Incentive Payments" or "Termination Payment." Nor does the Complaint reference or cite to those paragraphs of the Employment Agreement which concern said payments. The reason for these omissions is obvious – the Complaint was based solely upon Selfridge's alleged "ownership" of

1

BHHA, which discovery – and her own admissions, no less - have proven chimerical.

In an unconvincing effort to survive summary judgment, Plaintiff belatedly contends that she is entitled to a so-called "Termination Payment." The Court is well within its power to reject these newfangled claims. *See e.g., Damon v. Hukowicz,* 964 F.Supp.2d 120, 151 (D. Mass. 2013) (court may properly reject new claims "'that are not part of a complaint and are instead added for the first time in an opposition to summary judgment or in a memorandum in support of a motion for summary judgment.'") (Citation omitted.) In *Roberts v. Crowley,* 538 F.supp.2d 413, 417 (D. Mass. 2008) the court granted summary judgment for the defendant in a case involving Massachusetts' good funds statute. In so doing, the court noted that in their summary judgment papers, plaintiffs for the first time suggested a certain contractual theory of liability. The court rejected this attempted legerdemain, pointing out that :

> [n]o such theories were pleaded in the complaint, and plaintiffs do not articulate their theories with any precision. *It hardly bears mentioning that a plaintiff cannot raise a theory of liability for the first time in a memorandum in support of a motion for summary judgment.* (Emphasis added.)

*Id. See also In re Citigroup, Inc.,* 2011 WL 1326368 (D. Mass.) (Gertner, J.) at page 3, n. 4. Such is the case here. The testimony of Saul Benowitz – the attorney who drafted the Employment Agreement - makes abundantly clear that the signatories, including Selfridge, were not and could not be owners of the business. Plaintiff has attempted to conflate provisions in the Employment Agreement to share profits with an ownership interest in the business itself. Benowitz's testimony, as well as the plain language of the document, belie any notion of ownership in the company. In attempting to avoid summary judgment, Selfridge now claims that she is owed a so-called Termination Payment, or "Incentive Payments" well into the future, even though she has not worked at BHHA for several years. Not only are these claims to sizeable, on-going payments newly created, they are neither supported by the plain language of the operative document, nor any plausible common sense interpretation thereof.

Equally telling are the answers which the Plaintiff provided in response to Defendants' interrogatories on May 27, 2014. (See Ex. J to Defendants' memorandum in support of summary judgment.) Like the complaint, the answers are completely devoid of any reference to the terms "Termination Payment" or "Incentive Payment." Moreover, Interrogatory No. 24 asked Selfridge to include the specific manner and methodology used to calculate her alleged damages. She did not provide the calculation methodology requested. At deposition Selfridge testified she could not explain how she arrived at her "lost income" of $350,000 set forth in Answer No. 24. Thus, it is clear that Selfridge's summary judgment papers raise for the first time a theory of liability based upon contrived notions of monies to which she has no rights whatsoever.

## 2) The Realization of Incentive Payments was a Condition Precedent to Any Termination Payment Which Selfridge is Now Belatedly Claiming

Given that BHHA was a nascent company at the time the Employment Agreement was signed, Incentive Payments were expressly made conditional upon the company's ability to make them. (See paragraph 2(b) of Employment Agreement, Ex. B to Defendants' Summary Judgment memorandum.) Section 2 of the Employment Agreement deals with compensation. Even salary amounts for employees of the nascent company were subject to the existence of "sufficient cash flow." (See paragraph 2(a)). Incentive Payments were to be made to employees "provided that, *in the judgment of the Officers*, the financial condition of the Company warrants the same." (Emphasis added.) The discretionary nature of these payments was entirely justified (and prescient) because, as Selfridge herself testified, the company oft times did not have the money to pay even her salary, or that of the other individual defendants. Overdue missed salary payments had to be recorded, and paid when funds became available. (Anderson Dep., p. 23, Ex. H); (Selfridge Dep. pp. 78-79, Ex. A.) During Selfridge's tenure, BHHA payroll checks sometimes bounced due to insufficient funds. (Selfridge Dep. p. 78, Ex. A.)

Paragraphs 6, 7 and 8 of the Employment Agreement concerning Termination Payments are based upon the assumption that the company was in fact making Incentive Payments to employees like Selfridge at the time of an employee's termination - a condition precedent which never happened in Selfridge's case. Paragraph 6 states that where an employee is terminated *for adequate cause*, the company may make a "Termination Payment" or "*continu[e] to pay* the Employee his or her Incentive Payments." (Emphasis added.) Paragraph 8 governing termination *without adequate cause*, also provides that the company may make "*ongoing Incentive Payments* in the proportion set forth on Exhibit 'A.'" (Emphasis added.) Even paragraph 5 governing death or disability states that the company may "*continu[e] to pay the recipient* for the Employee's Incentive Payments." (Emphasis added.) Clearly, then, the Termination Payment provision (paragraph 7) which calls for a calculation based upon "present fair market value of the Employee's rights to receive Incentive Payments," makes the same common sense assumption, *i.e.*, that the employee had in fact been receiving Incentive Payments at the time of termination. Otherwise, paragraphs 5, 6 and 8 would be nonsensical in offering a payment option to the company upon an employee's termination *which did not exist*. Paragraph 8 of the Employment Agreement which expressly provides that if the employee is terminated "without 'Adequate Cause'... Company shall be required to make the Termination Payment, in full, within thirty (30) days after the effective date of termination." Under the Plaintiff's twisted interpretation, this express provision would also be mere surplusage since absent previous Incentive Payments, the calculation and making of the payment under this paragraph within the stated 30 days would be impossible. The Employment Agreement must be interpreted as a whole, and "'[e]very word and phrase must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable.'" *Riva v. Ashland, Inc.*, 2013 WL 1222393 (D. Mass.) (Caspar, J.) *quoting Jacobs v. U.S. Fid & Guar. Co.*, 417 Mass. 75, 77 (1994). Moreover, "[a]n interpretation which gives a reasonable meaning to all of the

4

provisions of a contract is to be preferred to one which leaves a part useless or inexplicable." *Jacobs*, 417 Mass. at 77. It is also clear that the word "present" in paragraph 7 which modifies the term "fair market value" means "right now or just now, currently, at this point," and "present day." Oxford American Dictionary & Thesaurus (Oxford University Press 2003). In the context of employment termination, the operative time is *when the termination occurred* – not some random, opportunistic future date of Plaintiff's unilateral choosing. "Where the meaning of a valid contract is in dispute, the Court must arrive at the proper interpretation by 'constru[ing] the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose.'" *Josef Gartner USA LP* v. *Consigli Construction Co., Inc.*, 2011 WL 2417137 (D. Mass.) (Saylor, J.) *quoting USM Corp.* v. *Arthur D. Little Sys.*, 28 Mass. App. Ct. 108, 116 (1989). Attorney Benowitz's testified that the term "reasonable present fair market value of the Employee's rights to receive Incentive Payments," meant as of the time of the triggering event – in Selfridge's case, when she was terminated in October 2012.

The undisputed fact is that no employee – including Selfridge – had received any Incentive Payments as of the time of Selfridge's termination because the nascent company could not afford to make them. If Selfridge had been receiving steady Incentive Payments on a quarterly basis prior to discharge, then a number would have existed from which a "present value" could have been calculated, but such was not the case. *See e.g., Massachusetts Municipal Wholesale Electric Company* v. *Town of Danvers*, 411 Mass. 39, 45 (1991) ("[a] condition precedent defines an event which must occur…before an obligation to perform arises under the contract…If the condition is not fulfilled, the contract, or the obligations attached to the condition, may not be enforced.") "The determination whether contractual language operates as a condition precedent …is a question of law for the court." *Edmonds* v. *United States,* 642 F.2d 877, 883 (1st Cir. 1981). The possibility that no Incentive Payments would be received by

5

employees is manifest in Section 2(b) of the Employment Agreement. This section makes any Incentive Payments purely discretionary, and dependent on the company's financial condition as judged by its management personnel. It is well settled that implied or constructive conditions to enforceability may arise at law without an manifestation of assent to their creation. *Id.* at 47 n. 4. Consequently, and logically, the possibility that no Termination Payment would be made is obvious since any such payment relies on the preexistence of actual Incentive Payments. "[E]mphatic or precise words are not absolutely necessary to create a condition…In the absence of the usual words, a condition precedent may nonetheless be found to exist if the intent of the parties to create one is clearly manifested in the contract as a whole." *Massachusetts Municipal Wholesale Electric Company* v. *Town of Danvers*, 411 Mass. 39, 46 (1991).

### 3) The Lack of Incentive Payments Was an Obvious Risk in the Contract

The Employment Agreement makes abundantly clear that Incentive Payments were always optional and purely discretionary. Consequently, so were any Termination Payments, the existence and calculation of which depended upon preexisting Incentive Payments. Plaintiff's own papers make clear that the Termination Payment she claims is due must be calculated *via* an analysis of Incentive Payments, *albeit* payments Ms. Murray has received above and beyond her salary. (See Plaintiff's Memorandum in Support of Summary Judgment, at page 12.) For instance, Selfridge claims she is entitled to "[t]he present value *as of the date of Ms. Selfridge's termination* of all incentive payments made to date to Ms. Murray plus the present value of all Incentive Payments to made [sic] in the future to Ms. Murray." *Id.* (Emphasis added.) It is undisputed that as of the date of Selfridge's termination, no one had received any Incentive Payments. Plaintiff's reliance on Ms. Murray's incentive payments –made well after Selfridge was gone - is disingenuous, at best. "Impossibility requires that the contract be based upon an assumption that is essential to the contract but fails to exist at the time performance is due."

*Winchester Gables, Inc.* v. *Host Marriott Corporation*, 70 Mass. App. Ct. 585, 596 (2007). The Plaintiff would have the court believe that she is in effect entitled to an annuity by virtue of the Employment Agreement. Although only eight months with the company- during which time it struggled financially - Selfridge claims it is somehow her choice to receive presently, the same six-figure discretionary payments being made to those who are making the company a success.

4) **Plaintiff Admits All Material Facts Negating Any Ownership Interest**

In her Statement of Undisputed Facts, the Plaintiff has admitted all material facts which demonstrate unequivocally that she never was and is not now an owner of the business. (See Plaintiff's Responses, at Document No. 32.) The Employment Agreement expressly states in several different locations that the signatories do not become and are not owners of the business. The Agreement also contains an express integration clause which states that, "[t]his Agreement constitutes the full and complete agreement of the parties hereto with *respect to the subject matter hereof.*" See Paragraph 11(f) of Employment Agreement, at page 5. Thus, Selfridge's contention that a separate "oral agreement" existed as to ownership is of no moment. The undisputed record makes clear that both negotiations leading up to the final form of the Employment Agreement, and the agreement itself, expressly disavowed the grant of any ownership interest in BHHA, and even involved and recited specific reasons why this was so. There is nothing in the Employment Agreement stipulating or even suggesting that the signatories were to "automatically" become owners of BHHA upon resolution of the then existing shareholder dispute. Nor is there anything in the Employment Agreement implying that *non-employees* like Selfridge could somehow become owners 'automatically" sometime in the future.

Moreover, as individual defendants Murray, Anderson and Perez were not owners of BHHA either before or after they signed the Employment Agreement, they had no authority to

"agree" that Selfridge was or would become an owner. Their subjective desires for ownership can have no legal ramifications whatsoever. Furthermore, the Operating Agreement for the LLC – BHHA – expressly provides that new members can only be admitted with the written consent of all members. (Ex. G, Operating Agreement at Section 9.1). Thus, even Mohamad Jama, the company CEO, did not have the unilateral authority to make Selfridge or any other individual a member of the company. *Compare George H. Davis* v. *Old Colony Railroad Company*, 131 Mass. 258 (1881) (*ultra vires* agreement not enforceable).

Respectfully submitted,<br>
**DEFENDANTS AND PLAINTIFFS**<br>
**IN COUNTERCLAIM**<br>
By their attorneys,<br>
MCLANE, GRAF, RAULERSON & MIDDLETON, P.A.<br>
<br>
*/s/ Andrew P. Botti*<br>
Andrew P. Botti, BBO No. 558755<br>
McLane, Graf, Raulerson & Middleton,<br>
Professional Association<br>
300 TradeCenter, Suite 7000<br>
Woburn, MA 01801<br>
Telephone:(781) 904-2700<br>
Facsimile: (781) 904-2708<br>
andrew.botti@mclane.com

Dated: September 4, 2014

### CERTIFICATE OF SERVICE

I, Andrew P. Botti, hereby certify that this 4th day of September, 2014, I served the foregoing document upon all counsel of record electronically through ECF.

*/s/ Andrew P. Botti*<br>
Andrew P. Botti