UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STACIE SELFRIDGE                    )
                                    )
            Plaintiff,              )
                                    )
                                    )   CIVIL ACTION NO.
      v.                            )   13-11108-DPW
                                    )
MOHAMED JAMA, TRICIA MURRAY,        )
BAMBIE ANDERSON, NOEMI PEREZ,       )
and BOSTON HOME HEALTH AIDES, LLC,  )
                                    )
            Defendants.             )


MEMORANDUM AND ORDER
March 24, 2016

     This action arises out of the termination of the plaintiff,

Stacie Selfridge, from her employment at Boston Home Health

Aides, LLC ("Boston Home Health"), where she served as a manager

and allegedly anticipated obtaining an ownership interest in the

company.  Selfridge seeks declaratory and monetary relief for

unpaid compensation, emotional distress, and breach of contract

and fiduciary duty claims.  The defendants — Boston Home Health,

Mohamed Jama (the chief executive officer), and employees Tricia

Murray, Bambie Anderson, and Noemi Perez — assert counterclaims

alleging Selfridge's violation of duties to the company and

abuse of process.  I have before me the parties' cross-motions

for summary judgment, two motions to strike, and the defendants'

motion for a protective order to prohibit the plaintiff from taking two supplemental depositions.

## I. BACKGROUND

### A. *Factual Background*

#### 1.  Formation and Membership of Boston Home Health

Boston Home Health, incorporated on January 4, 2010, is a Massachusetts limited liability company formed for the purpose of providing home health care services, nursing services, and related activities.  The company is managed by its members, who are authorized to act on behalf of and manage the company.  This authorization includes entering into agreements, executing contracts and documents, engaging employees and agents, defining such employees' duties and compensation, and establishing member and employee benefit and incentive plans.  Members are entitled to distributions from the company "from time to time . . . after the Members determine in their reasonable judgment that the Company has sufficient cash in excess of the current and the anticipated needs of the Company to fulfill its business purposes."  Such distributions are made in accordance with each member's sharing ratio.

The original members of Boston Home Health were Jama, Abdulkadir Mohamed, and Barlin Hassan.  Under the terms of the operating agreement, the original members agreed to make initial

capital contributions, with Jama contributing $250 and obtaining an initial sharing ratio of 1/2, and Mohamed and Hassan contributing $125 each and each obtaining an initial sharing ratio of 1/4.  The operating agreement permits the addition or withdrawal of members with the written consent of all existing members.[1]  No additional members have been added since the operating agreement was executed.

### 2. Selfridge and Other Individual Defendants Join Boston Home Health

Selfridge, Murray, Anderson, and Perez joined Boston Home Health as employees in late 2011, when the company had approximately 25 to 35 patients.  Selfridge is a certified occupational therapist assistant who performed primarily administrative work for Boston Home Health.  Murray is a physical therapist who took on an administrative management role at Boston Home Health in February 2012; Anderson is a registered nurse who served as assistant director of nursing; and Perez performs marketing work.

---

[1] This is consistent with the requirements of Mass. Gen. Laws ch. 156C, § 20 (admission as a member of a limited liability company).  Under the terms of the operating agreement, an additional member must make an initial capital contribution as set forth in an admission agreement signed by the company and the additional member.  When a member withdraws, he or she must sign a withdrawal agreement with the company.

*a.  The Employment Agreement*

The employment of the four women at Boston Home Health was governed by an employment agreement that all four signed along with Jama and Liban Abdulle, another employee, on February 1, 2012.  This agreement was crafted by Attorney Saul Benowitz with the purported intention of governing the parties' relationships until a dispute between Mohamed (one of the members) and Boston Home Health was resolved.  The agreement states that it does not create or confer any membership or ownership interest beyond what is provided for in the operating agreement, and that it is intended "to enable the business of the Company to proceed to the mutual benefit of the parties" without adding new members.

*i.  Management and Compensation Provisions*

Although the employment agreement does not create new members, it vests management authority for the company in Selfridge and Jama as officers, giving Jama the precedential decision where the two officers disagree.[2]  The employment

---

[2] This provision of the employment agreement is potentially at odds with the operating agreement, which requires that management decisions be made by affirmative vote of members whose interests constitute a majority of the sharing ratios of all the members.  It may also be at odds with Massachusetts corporate law, which appears to require that managers be designated by the operating agreement or that the addition of other managers be provided for in the operating agreement.  *See*

agreement also sets forth the compensation (including profit sharing), duties and responsibilities, termination procedures, confidentiality requirements, non-assignment and non-compete requirements, and other employment terms for the employee signatories.  It provides that Selfridge, Anderson, Murray, and Perez are each to receive a salary of $2,000, presumably per week.  The employee signatories shall also receive "incentive payments" on a quarterly basis or more frequently if the officers determine that "the financial condition of the Company" warrants such payment.  Selfridge, Anderson, and Murray are each to receive 14.5% incentive payment shares, and Perez is to receive a 6.5% incentive payment share, presumably of whatever funds are authorized to be used for incentive payments. Finally, the agreement provides for officer approval of overtime hours and additional overtime compensation.

   *ii.  Termination Procedures*

   If an employee is terminated, the employment agreement provides for two compensation scenarios: a termination payment or continued payment of the employee's incentive payments.  When the employee is terminated by the company for "adequate cause"[3]

---

Mass. Gen. Laws ch. 156C, §§ 2(7), 26(a).  However, Selfridge does not press these potential conflicts.
[3] "Adequate cause" is defined by the agreement as "(i) fraud, embezzlement, or other intentional misappropriation by the

or at the voluntary election of the employee, the company selects the compensation option.  When an employee is terminated without adequate cause by agreement of the officers, the employee selects the compensation option.

Incentive payments upon termination are made consistent with the incentive payment shares defined in the agreement.  The termination payment consists of "the reasonable present fair market value of the Employee's rights to receive Incentive Payments, to the same extent as if said rights were freely assignable."  If the employee voluntarily left or has been terminated for adequate cause, the termination payment is reduced by "twenty-five (25%) of such determined value" and by "any amounts due to Company on account of [any] acts or omissions of the Employee constituting 'Adequate Cause,'"[4] and the company may elect to make the payment either in a lump sum of by delivery of a promissory note.  If the employee was terminated without adequate cause and opts to receive a

---

Employee from the Company; (ii) conviction of the Employee of a felony or a misdemeanor involving moral turpitude; or (iii) conduct by the Employee involving gross negligence, willful misconduct or other action which materially damages the reputation or business of the Company.  The existence of Adequate Cause shall be determined by unanimous vote of the remaining Employees of the Company."

[4] This calculation is to be reached by agreement of the company and the employee or his or her legal representative, or if an agreement cannot be reached, by a certified public accountant.

termination payment, he or she is entitled to full payment
within thirty days of termination.

### 3.    Selfridge's Termination

Selfridge was terminated on October 15, 2012, after
approximately eight months of employment at Boston Home Health,
through an email from Jama.  She contends that she was never
informed that her performance was inadequate and instead that
she received positive reviews from Murray, who was apparently
her supervisor.[5]  The defendants have articulated a variety of
reasons for her termination, including that she failed to work
more than five to ten hours a week at certain times because she
was attending a master's degree program, that she engaged in
threatening conduct and was difficult to work with, that she
wrote checks to at least one vendor that was not a Boston Home
Health vendor, that she promised to bring new clients to the
company but failed to do so, that she lacked the qualifications
to perform her job responsibilities, and that she engaged in
fraudulent activity regarding therapy visit notes submitted to
MassHealth, for which the company had to return approximately
$10,000 in payments.  Selfridge denies all of these claims
except for her participation in a clinical program for her

---

[5] Selfridge concedes she had received some warning from Liban
Abdulle, who informed her on October 13 that she would be
terminated.

7

master's degree, which required her to be away from her office during business hours five days a week for twelve weeks during her employment at Boston Home Health; she claims that she did her work for the company at other times.

## B.    *Procedural History*

The plaintiff filed her complaint on May 5, 2013 seeking recovery for "a freeze out as to her employment at, and ownership of" Boston Home Health.  She seeks a declaratory judgment that she is entitled to 14.5% of the value of Boston Home Health, monetary damages for her termination without cause and her unpaid compensation, and an award of attorneys' fees, based on her claims of breach of fiduciary duty, negligent and intentional infliction of emotional distress, breach of contract, violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, and violation of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, §§ 148, 150.

The defendants filed their answer and counterclaims against the plaintiff on July 25, 2013, to which Selfridge responded on August 1.  The parties then engaged in discovery, including numerous depositions.[6]  Nearly a year later, on July 22, 2014, the parties provided a joint status report indicating that two

---

[6] Throughout this case, the parties have had some concerns about confidentiality.  On April 11, 2014, I entered an order of confidentiality in accordance with the parties' stipulation.

depositions remained and would be completed by July 31, document discovery would be completed by July 30, and motions for summary judgment would be filed by July 31.  On July 29, the defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56 as well as a motion for a protective order to prohibit the belated depositions of two individuals other than those contemplated by the July 22 status report.

Selfridge opposed the motions for summary judgment and for a protective order, and in so doing filed her own motion for summary judgment, seemingly limited to one issue: her purported right to incentive payments.[7]  The defendants opposed Selfridge's summary judgment motion, and Selfridge has filed a reply.  In addition, Selfridge moves to strike certain statements made by the defendants in their memorandum, and the defendants move to strike portions of Selfridge's affidavit.  Both motions to strike are opposed.

### II. DEFENDANTS' MOTION FOR A PROTECTIVE ORDER AND TO PROHIBIT FURTHER DISCOVERY

#### A.  *Background*

As noted above, on July 22, 2014, the parties informed me

---

[7] Although none of Selfridge's filings are docketed as a motion for summary judgment, it is clear that Selfridge intended to move for summary judgment to some extent.  The defendants clearly consider the plaintiff to have moved for summary judgment as well.

that two depositions remained and would be completed by July 31,
that document discovery would be completed by July 30, and that
motions for summary judgment would be filed by July 31.
According to the defendants, the two remaining depositions
contemplated by the July 22 status report were of Perez – one of
the named defendants – and of Liban Abdulle.  These depositions
were scheduled to occur on July 28 and July 31, respectively.

Following the deposition of Perez on July 28, attorneys for
both parties orally confirmed that the last deposition was to
occur on July 31.  But later that day, defendants' counsel
received notices from plaintiff's counsel, dated July 25, 2014,
for the additional depositions of Mohamed — the member engaged
in a legal dispute with Boston Home Health — and his counsel,
Cameron Pease, on August 1.  On July 24, 2014, Mohamed and
Boston Home Health had reached a settlement agreement in
principle, which Boston Home Health expected would remain
confidential.  In seeking to depose Mohamed and his attorney,
and to obtain a copy of the settlement agreement, Selfridge
purportedly sought to verify that a settlement agreement had
indeed been reached and the dispute between Mohamed and Boston
Home Health had been resolved.

On July 29, concurrent with their motion for summary
judgment, the defendants filed the instant motion for a

protective order as to the settlement discussions, negotiations,
and agreement in the Mohamed litigation and to prohibit further
discovery through the depositions of Mohamed and Pease.  The
defendants contend that the deposition notices were untimely and
would add nothing to the summary judgment record, because they
pertain to witnesses who have no relevant knowledge of the
matter.  They further contend that the information regarding the
settlement would be inadmissible in this litigation and
therefore it adds no value to Selfridge's case.[8]  At a hearing on
this matter on January 7, 2015, I directed the defendants to
provide a copy of the settlement agreement, which was executed
on August 26, 2014, to the plaintiff under seal, and afforded
Selfridge an opportunity to respond to the agreement.[9]  Given
these developments, to the extent the defendants sought to
prohibit Selfridge's access to the settlement agreement, that
request is now moot.

---

[8] The defendants' contention that the settlement agreement and
its contents would be inadmissible is incorrect.  "[C]ourts can
allow the discovery of information contained in and related to
confidential settlement agreements," but a high burden must be
met.  *Atchison Casting Corp.* v. *Marsh, Inc.*, 216 F.R.D. 225, 226
(D. Mass. 2003).  Where a settlement agreement from a prior
lawsuit "concerns the very facts underlying the parties'
dispute" and "bears directly on the damages Plaintiff seeks,"
discovery of the settlement agreement is appropriate.  *Id.*
[9] In her response to the settlement agreement, Selfridge merely
rehashes the arguments she has made previously regarding her
anticipated ownership in Boston Home Health.

## B.   Discussion

As the question of access to the settlement agreement has been resolved, I address only Selfridge's request to depose Mohamed and his attorney.   Selfridge has not sought leave from this court to conduct these depositions.   "Ordinarily, a party who wishes to conduct further discovery before the court acts on a summary judgment motion should present timely affidavits" under Fed. R. Civ. P. 56(d) explaining why certain critical facts are as of yet unavailable.[10]   *Nestor Colon Medina & Sucesores, Inc.* v. *Custodio*, 964 F.2d 32, 38 (1st Cir. 1992); see *Filiatrault* v. *Comverse Tech., Inc.*, 275 F.3d 131, 137 (1st Cir. 2001) ("The management of pretrial discovery lies primarily within the sound discretion of the district court.").   Although the deposition requests were served on the defendants before the close of the discovery period, Selfridge represented in the July 22 joint status report that discovery would be completed and summary judgment motions filed by July 31.   Clearly, depositions scheduled to occur on August 1 fall outside these bounds. Selfridge accordingly bears the burden of "articulat[ing] a plausible basis for the belief that discoverable materials exist

---

[10] As part of a 2010 revision of Rule 56, "[s]ubdivision (d) carries forward without substantial change the provisions of former subdivision (f)."   Fed. R. Civ. P. 56 advisory committee's note.

which would raise a trialworthy issue." *Price* v. *Gen. Motors Corp.*, 931 F.2d 162, 164 (1st Cir. 1991).  Her memorandum in opposition to the defendants' motion fails to serve as an affidavit required under Rule 56(d) to carry this burden. Nonetheless, I will consider the arguments she makes there.

Selfridge's proffered reason for wanting to depose Mohamed and his attorney is that she wishes to confirm that the dispute with Mohamed has been resolved — not that she believes they can provide any substantive support for her claims.  This reason has been addressed by her receipt of the settlement agreement between Mohamed and Boston Home Health.  Selfridge has not demonstrated that any additional information that could be obtained by deposing Mohamed or his attorney would create a trialworthy issue or even add any evidence of value to her case. In addition, Selfridge has puzzlingly stated that the issue of ownership — which from her perspective is conditioned on resolution of the Mohamed dispute — is not important at this stage.  In her opposition to the defendants' summary judgment motion and her own motion for summary judgment, Selfridge states that "ownership is not the dispositive factor" for her claims, and that "[s]he . . . understands that issues of fact preclude a decision on that point at this time" because of the dispute between Mohamed and Boston Home Health.  Where Selfridge has

13

stated that the pending claims in her case can be resolved
without an answer to the ownership question, she has failed to
demonstrate how additional evidence of ownership is relevant.
Selfridge has offered no "plausible basis to support a belief
that discoverable material exists which . . . would suffice to
raise a trialworthy issue." *Filiatrault*, 275 F.3d at 138.  The
change in circumstances of a recent resolution in the known
dispute between Mohamed and Boston Home Health alone does not
merit further discovery.  Accordingly, I will not permit further
discovery absent satisfaction of Fed. R. Civ. P. 56(d).

### III. MOTIONS TO STRIKE

Both parties have filed motions to limit the evidence
considered for summary judgment.  Generally, "only evidence that
would be admissible at trial may be considered in connection
with a motion for summary judgment." *Barraford* v. *T & N Ltd.*,
988 F. Supp. 2d 81, 84 (D. Mass. 2013) (citing *Garside* v. *Osco
Drug, Inc.*, 895 F.2d 46, 49-51 (1st Cir. 1990)).  The proponent
of the challenged evidence must prove its admissibility.  *See
id.*  I will consider each of the parties' motions in turn.

### A.    *Selfridge's Motion to Strike*[11]

Selfridge objects to seven statements of fact in the defendants' memorandum in support of their motion for summary judgment,[12] asserting that these statements should be stricken for lack of foundation and hearsay.[13]

### 1.    Challenges for Lack of Foundation

#### a. Statement 2

Selfridge moves to strike the statement that "[a]t best Selfridge worked maybe 10 hours per week," and that "[s]he spent three months of the eight with [Boston Home Health] in an all-day clinical training for school, not at [Boston Home Health]." This statement is based on Murray's deposition testimony as to Selfridge's minimal working hours and on Selfridge's own deposition testimony. Selfridge contends that Murray failed to provide any evidence that she was aware of all of the hours

---

[11] As a threshold matter, the defendants contend that Selfridge's motion to strike should be denied because she failed to comply with Local Rule 7.1 requiring conferral between the parties prior to filing a motion. Although compliance with Rule 7.1 is of significance, I will nonetheless consider the merits of her motion. *See Maloney* v. *Town of Hinsdale*, Civ. No. 11-11297-MAP, 2012 WL 4103909, at *2 (D. Mass. Aug. 10, 2012) ("a violation of the rule does not *necessitate* summary denial").

[12] The defendants incorporated their statement of undisputed facts into their memorandum. *See* note 17, *infra*.

[13] To the extent the plaintiff raises additional objections in her statement of undisputed facts, these objections are not considered at this point because they were not specifically stated in the motion to strike.

Selfridge worked, and therefore the statement lacks a proper foundation.

Under Fed. R. Evid. 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." *Id.* The defendants state that as Selfridge's direct supervisor, Murray was aware of Selfridge's assignments and knew that she could not perform much of her work remotely. Murray stated that Selfridge "wasn't there but maybe four or five hours a week, realistically" and that "[s]he would claim she was working from home; however, she didn't have access to the portal, nor was she qualified to do QA as a coder." Given Murray's supervisory role and her familiarity with Selfridge's work, there is an adequate foundation for the first statement. The second statement, that Selfridge spent three months engaging in clinical training for a master's degree while she was employed by Boston Home Health, is taken directly from Selfridge's deposition testimony and is therefore admissible.

  *b. Statement 3*

Selfridge moves to strike for lack of foundation the statement that "Selfridge did not get along with the other BHHA employees, its lawyer, or its landlord, and people left the

Company because of her." She asserts that the defendants have not offered the testimony of any of these individuals stating as such. The defendants contend that the basis for this statement is the deposition testimony of Murray, Selfridge's supervisor, who had first-hand knowledge of various individuals' views on Selfridge. This is sufficient to establish a foundation for personal knowledge.

> *c. Statement 6*

Selfridge moves to strike Murray's conclusions regarding Selfridge's preparation of notes in her work with Janet Lucey, asserting that Murray has no knowledge as to how the notes were prepared. Specifically, Murray stated that occupational therapy evaluation forms are supposed to be completed by a registered Certified Occupational Therapist (COT) and that she had learned that certain therapy visit notes were signed by Lucey, a COT, but in the handwriting of Selfridge, who is not authorized to complete the form. Murray stated that Selfridge paid Lucey for her signature and conducted the subsequent visits herself. She further speculated as to why Selfridge would take this approach, positing that Lucey had a busy schedule and was probably unable to do the visits herself. Murray attempted to reach Lucey about this matter but was unable to. Boston Home Health ultimately returned the funds Mass Health had paid for these visits.

The defendants contend that Murray testified based on her personal knowledge as a certified physical therapist as to proper procedure and her personal knowledge of Selfridge's handwriting and qualifications.  Although several portions of Murray's testimony are properly based on this personal knowledge, Murray's speculation as to why Selfridge would have engaged in this conduct is not and is therefore inadmissible.

2.   Challenges for Hearsay

a. *Statement 1*

Selfridge moves to strike as inadmissible hearsay a statement Murray made in her deposition regarding one of the reasons for Selfridge's termination:

> [O]ur Assistant Director of Nursing had come to us stating that Stacie had approached her and said quote, "I'm going to [expletive deleted] everybody at Boston Home Health and bring it down," to which Judy replied, "Please don't do that."  And she said quote, "Watch me."  That was the final day that they decided to let her go.

"Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment." *Garside*, 895 F.2d at 50. The defendants correctly contend, however, that this statement is admissible as a statement of a party-opponent, Fed. R. Evid. 801(d)(2)(A), and under the state of mind exception to the hearsay rule. *See* Fed. R. Evid. 803(3).  Indeed, these statements are not offered for the truth of the matter asserted,

18

but rather to demonstrate that Selfridge had a hostile state of mind toward Boston Home Health at the time they were made.  As such, they are admissible.

   *b. Statement 4*

Selfridge moves to strike the statement that "Selfridge was insubordinate to BHHA's Chief Executive Officer," found in Murray's deposition testimony, because she contends that it is based on a conversation between Murray and Jama and must be offered by Jama if at all.[14]  The defendants correctly contend that this fails to qualify as a "statement" for the purposes of the hearsay rule.  "Hearsay must be a 'statement,' *i.e.,* either '(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." *Staelens ex rel. Estate of Staelens* v. *Staelens*, 677 F. Supp. 2d 499, 504 (D. Mass. 2010) (quoting Fed. R. Evid. 801(a)(c)).

---

[14] At the deposition, the following dialogue occurred between Attorney Trombetta and Tricia Murray:
   Q: What did [Selfridge] do that made her disruptive?
   A: She was hyperverbal, loud, always in a bad mood, disagreed with everybody's opinion in a loud manner. She was insubordinate.
   Q: When was she insubordinate?
   A: To [Jama].
   Q: How?
   A: Telling him that he could only be paid for 20 hours a week as the CEO of the company because she needed a paycheck because she left a job for employment at Boston Home Health.

This sentence sets forth facts in the form of the report apparently overheard by Murray, rather than "any statement or conduct by a declarant intended as an assertion." *Id.* The facts asserted in this sentence are admissible.

   *c. Statement 5*

  Selfridge moves to strike Murray's statement in her deposition that Selfridge falsely claimed that she knew patient referral sources but did not bring any new patients to the company, and that Selfridge actually lost patients for the company by failing to show up at their homes. Selfridge contends that these facts must come in through the testimony of a patient who had left for this reason, rather than through Murray's impression.

  To the extent Murray states that Selfridge joined Boston Home Health because "she said she knew all these referral sources and these resources that could help grow this company, which, in turn, she did not and did not bring one client to the company," those statements appear to be based on Murray's personal knowledge of what Selfridge said and are admissible as statements of a party-opponent. *See* Fed. R. Evid. 801(d)(2)(A). As to the lost clients, Murray states that Selfridge "in fact, lost several clients for Boston Home Health for failure to show up at their homes." She seems to base this statement on

conversations she had with nursing supervisors who informed
Murray that their clients reported that Selfridge visited but
did not perform her duties.  Defendants do not offer any
justification for this portion of the challenged statement.
Therefore, the portion of the statement pertaining to clients
leaving Boston Home Health is stricken.

> d. *Statement* 7

Finally, Selfridge moves to strike Attorney Benowitz's
statement that Selfridge's attorney contacted Benowitz and told
him that he was "ok" with the employment agreement.  Defendants
contend that Selfridge's attorney was her authorized agent for
review of the employment agreement, and therefore his statement
is admissible.  Under Fed. R. Evid. 801(d)(2)(C),(D), a
statement by a person authorized by an opposing party to make a
statement on that subject, including an agent acting within the
scope of that relationship, is not hearsay.  Accordingly, this
statement is admissible.

### 3.  Summary

The second part of statement 5 is stricken (that Selfridge
"lost patients by not showing up at their homes"), as are those
portions of statement 6 regarding Murray's speculation of the
reasons for Selfridge's conduct in preparing certain therapy

visit notes.  Otherwise, Selfridge's motion to strike will be
denied.

## B.  *Defendants' Motion to Strike Selfridge's Affidavit*

The defendants move to strike the entirety of Selfridge's
affidavit submitted in support of her cross-motion for summary
judgment and opposition to the defendants' motion for summary
judgment on the basis that it directly contradicts the sworn
deposition testimony of Selfridge, relies on impermissible
hearsay, and recites conclusory allegations rather than facts.

Under Fed. R. Civ. P. 56(e)(1), an affidavit opposing
summary judgment must "set out facts that would be admissible in
evidence."  Affidavits submitted by witnesses who have already
been deposed may be considered by the court when the earlier
testimony was vague, but require explanation for consideration
if the earlier testimony was clear.  "A subsequent affidavit
that merely explains, or amplifies upon, opaque testimony given
in a previous deposition is entitled to consideration in
opposition to a motion for summary judgment."  *Gillen* v. *Fallon
Ambulance Serv., Inc.*, 283 F.3d 11, 26 (1st Cir. 2002).
However, "[w]hen an interested witness has given clear answers
to unambiguous questions, [s]he cannot create a conflict and
resist summary judgment with an affidavit that is clearly
contradictory, but does not give a satisfactory explanation of

22

why the testimony is changed." *Colantuoni* v. *Alfred Calcagni & Sons*, 44 F.3d 1, 4-5 (1st Cir. 1994).  An affidavit that is simply "an attempt to manufacture an issue of fact in order to survive summary judgment" is not admissible.  *Orta-Castro* v. *Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105, 110 (1st Cir. 2006).

Like the affidavit rejected in *Orta-Castro*, Selfridge's affidavit was executed after the defendants filed their motion for summary judgment, and after Selfridge had been deposed, "thus suggesting that the [affidavit] was made solely to create an issue of fact for the purpose of surviving summary judgment." *Orta-Castro*, 447 F.3d at 110.  Indeed, the affidavit was executed four days before Selfridge filed her opposition to the defendants' motion.  *Cf. id.*  *Contrast Chiang* v. *MBNA*, 620 F.3d 30, 31 n.3 (1st Cir. 2010) (appropriate for district court to consider affidavit executed after witnesses' depositions had been taken because "court requested additional discovery to clarify" certain issues).  Selfridge has offered no explanation for why she believed a supplemental affidavit was necessary.

These indications of a last-ditch survival tactic give me pause.  Clearly, the affidavit serves as a direct rebuttal to the arguments and theories presented by the defendants in their summary judgment motion.  But the defendants have not adequately

identified the determinative feature that would merit my disregard of the affidavit: direct conflict between the earlier and supplemental testimony. *See Orta-Castro*, 447 F.3d at 110 (affidavit disregarded because it was in conflict with earlier deposition answers and proffering party had offered no credible explanation for the subsequent change in testimony); *Colantuoni*, 44 F.3d at 4-5 (same).

The defendants point to only two paragraphs of the affidavit that they consider to be directly at odds with Selfridge's deposition testimony:[15] ¶ 29 and ¶ 31, stating that she requested and expected overtime payment, which conflicted with her clear testimony at her deposition that Boston Home Health did not pay overtime while she was employed there. Selfridge contends that there is nothing inconsistent in stating that Boston Home Health does not pay overtime but that she nonetheless asked Jama to pay her overtime and does not know if he would have decided to do so. I agree with Selfridge that the statements are not in direct contradiction to her testimony and, although perplexing, need not be stricken on the basis of direct contradiction. The necessary conflict for disregard of a duly-

---

[15] At the hearing on this matter, I afforded defendants' counsel an opportunity to expand their identification of direct conflicts, but they did not do so.

sworn affidavit has not been identified here.  Where the
deposition testimony on a particular issue "was neither clear
nor unambiguous," a supplemental affidavit is appropriate and
indeed must be considered in opposition to a motion for summary
judgment.  *Gillen*, 283 F.3d at 26.  The defendants have not
demonstrated the necessary conflict for the affidavit overall.

I am similarly unpersuaded by the defendants' hearsay
argument.  In paragraphs 24 and 25 of her affidavit, Selfridge
states that she has had "many conversations with numerous
representatives of various providers and with business
representatives," that none of them have "indicated in any way
that any actions which [she] had undertaken at Boston Health had
hurt the company's reputation," and that she "do[es] not believe
that they have any knowledge of what I had done at Boston
Health."  She further states that she did not take any actions
that injured the reputation of Boston Home Health.  The
defendants contend that these paragraphs constitute inadmissible
hearsay because they attempt to "climb into the minds" of third
parties.  Ultimately this proffer does not shed light on the
question whether Selfridge's termination was for adequate cause,
although this is quite apparently the goal of her statements in
the affidavit.  Her recounting of statements made by others
("various providers and business representatives") runs afoul of

the hearsay rule, although her characterization of their

knowledge of matters occurring at Boston Home Health does not.

Accordingly, absent the identification of a conflict, I

will consider the affidavit, apart from the effort to report

what Selfridge heard others say.

### IV. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment practice is "to pierce the

pleadings and to assess the proof in order to see whether there

is a genuine need for trial." *Garside*, 895 F.2d at 50 (citation

omitted).  Summary judgment is appropriate when, based on the

pleadings, discovery, and disclosure materials in the record,

"there is no genuine dispute as to any material fact and the

moving party is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a), (c).  A "genuine" dispute is one that, based

on the supporting evidence, "a reasonable jury could resolve

. . . in favor of the non-moving party," and a "material" fact

is one that has "the potential to affect the outcome of the suit

under the applicable law." *Sanchez v. Alvarado*, 101 F.3d 223,

227 (1st Cir. 1996) (citations and quotation marks omitted).

When reviewing a motion for summary judgment, I view the

facts "in the light most favorable to the non-moving party."

*Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir.

1999).  If the moving party satisfies the burden of showing,

based on evidentiary material, that there is no genuine issue of
material fact, the burden shifts to the nonmoving party to
demonstrate by reference to other evidentiary material "that a
reasonable jury could return a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *See
Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).
"[C]onclusory allegations, improbable inferences, and
unsupported speculations" are insufficient to establish a
genuine dispute of fact.[16]  *Medina-Munoz v. R.J. Reynolds Tobacco
Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

---

[16] At various points in her opposition to the defendants' motion
for summary judgment and her own motion for summary judgment,
Selfridge asks this court to draw inferences in her favor from
the invocation by Jama and Abdulle of their Fifth Amendment
privilege against self-incrimination in refusing to answer
questions at their depositions.  Although an adverse inference
may be drawn in a civil matter from a party's assertion of the
Fifth Amendment privilege, silence cannot be given any "more
evidentiary value than [is] warranted by the facts surrounding
the case." *Baxter* v. *Palmigiano*, 425 U.S. 308, 317-18 (1976).
Indeed, "the entry of judgment based only on the invocation of
the privilege and 'without regard to the other evidence' exceeds
constitutional bounds." *LaSalle Bank Lake View* v. *Seguban*, 54
F.3d 387, 391 (7th Cir. 1995) (citations omitted).   What more
is required, however, appears to be an open question in this
circuit.  Judge Stearns recently acknowledged that the First
Circuit has not made clear whether and to what extent an adverse
inference may be drawn from a party's silence at the summary
judgment stage.  *See Unum Group* v. *Benefit P'ship, Inc.*, 938 F.
Supp. 2d 177, 184 (D. Mass. 2013) (citing *In re Marrama*, 445
F.3d 518, 522-23 (1st Cir. 2006)).  *Unum Group* did not grapple
with the issue, because Judge Stearns concluded that "even when
permitted at the summary judgment stage, an adverse inference,
standing alone, is not sufficiently conclusive evidence to

Where, as here, both parties have moved for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Bienkowski* v. *Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir. 2002) (citation omitted); *see Mandel* v. *Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006).  Summary judgment is appropriate if "either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Group, Inc.* v. *Ferré Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001).

## V. DISCUSSION OF SUMMARY JUDGMENT MOTIONS

Selfridge seeks a declaratory judgment as to her ownership interest (Count I) and asserts claims of breach of fiduciary duty (Count II), negligent infliction of emotional distress (Count III), intentional infliction of emotional distress (Count IV), breach of contract (Count V), violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* (Count VI), and violation of the Massachusetts Wage Act, Mass. Gen. Laws ch.

---

satisfy a moving party's burden."  *Id.* (citing *LaSalle Bank*, 54 F.3d at 389-94, and other cases).  Here, it is sufficient to conclude that some independent evidence in the record is required to support the underlying allegations.  *Id.*

149, §§ 148, 150 (Count VII).  The defendants raise several counterclaims that are not the subject of the instant motions.

The defendants have moved for summary judgment as to all counts of Selfridge's complaint.[17]  They contend that the undisputed evidence demonstrates that Selfridge is not and never has been an owner of Boston Home Health, that her termination was justified and complied with the terms of the employment agreement, that the payments she claims she was denied were entirely discretionary, and that she is not entitled to relief under either the Fair Labor Standards Act or the Massachusetts Wage Act.  Selfridge opposes all of these arguments and asks that the defendants' motion for summary judgment be denied in full.  She also moves for summary judgment as to her claim regarding incentive payments, which can fairly be read as a

---

[17] Selfridge apparently believes that the defendants did not comply with the requirement of Local Rule 56.1 that a moving party provide "a concise statement of material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions, and other documentation."  Failure to comply with this requirement can be a basis for denial of a motion for summary judgment.  However, the defendants have adequately complied with Rule 56.1.  Although a moving party often submits a separate document providing an enumerated list of material facts, the defendants' inclusion of this statement of material facts in their memorandum in support of their motion satisfies this requirement.

claim for breach of contract in Boston Home Health's failure to make such payments to her.

## A.    *Ownership Interest (Count I)*

The parties agree and the record makes clear that Selfridge was never made a member or owner of Boston Home Health.  The employment agreement governing Selfridge's relationship to Boston Home Health explicitly states that it does not confer membership on any of the employee signatories.[18]  Indeed, no additional members have been added since the initial operating agreement identifying Jama, Mohamed, and Hassan as members.[19]

---

[18] Specifically, the employment agreement provides that:

> [N]otwithstanding that some or all of the Employees may ultimately desire to gain admission as Members of the Company, this Agreement, and the payments and benefits to be conferred upon the Employees hereunder, are not intended (in themselves) to confer any indicia of ownership in the Company, but only to recognize, in the form of compensation for services rendered (through payment of wages, overtime, and "incentive" payments), the contributions of the various Employees to the ongoing business and success of the Company; nothing contained herein is intended to have the effect of contravening either the Company's Certificate, Operating Agreement, or the requirements of M.G.L., Ch. 156C.

It also states that "this Agreement provides for Employee compensation only, and does not, nor is it intended to, create any membership or ownership interest in the Company except as may otherwise exist under its Operating Agreement, and as the same may be modified, amended, or supplemented hereafter."
[19] Not only did the terms of the employment agreement specifically state that it did not grant membership, but

Selfridge nonetheless contends that she was promised membership once the dispute with Mohamed was resolved.  Although she acknowledges the express integration clause in the employment agreement, she contends that the parties had a separate verbal agreement that remains enforceable.  She asserts that the extensive emphasis in the employment agreement on the dispute with Mohamed as precluding Selfridge and the other women from becoming members demonstrates that there was a verbal agreement to pursue membership after resolution of the dispute.[20] She points also to an email from Benowitz to Selfridge — in which he shared a draft of the employment agreement and described his attempt to capture the "profit sharing" element while avoiding the appearance of ownership interests, as that could not be achieved under the circumstances at the time — as demonstrating that the employment agreement was intended to convey the benefits of ownership without doing so by terms.  In

---

Selfridge's status as a manager of the company also did not confer membership as a matter of law.  Under Massachusetts corporate law, managers of limited liability companies "need not be a member of the limited liability company." Mass. Gen. Laws ch. 156C, §§ 24, 25.

[20] The employment agreement indicates that it is in effect "pending resolution of matters between the Company and Abdul [Mohamed], [] unless and until this Agreement is terminated, modified, or amended." Importantly, modification of the agreement must be "in writing and duly executed by all of the Employees."

short, Selfridge understood that she and the other women would become owners automatically upon resolution of the issues with Mohamed, and seeks to enforce that promise now that Mohamed is no longer a member.[21]

The defendants rely on the same evidence to argue that it was clear that membership was not guaranteed for Selfridge, and that at best Selfridge had "an agreement to agree concerning her eventual admittance as a member of [Boston Home Health]." They also point to the testimony of Benowitz, who drafted the operating agreement and the employment agreement, that "there was nothing in this agreement, or discussed, that anything would happen automatically upon either that occurrence, or anything else."

Typically, when a written agreement is executed, there is "a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled." *Rosenfield* v. *U.S. Trust Co.*, 195 N.E. 323, 325

---

[21] Selfridge also provides copies of the Facebook pages of Murray and Anderson indicating that they are owners of Boston Home Health, in support of her apparent assertion that the women now members because of the promise of membership upon resolution of the Mohamed dispute. The defendants contend that these representations cannot establish ownership rights as a matter of law because they are "inactionable statements of opinion" rather than statements of fact. *NPS, LLC* v. *Ambac Assur. Corp.*, 706 F. Supp. 2d 162, 171 (D. Mass. 2010). I find these admissions to be marginal but hardly persuasive evidence on the ownership question.

(Mass. 1935).   Indeed, the parole evidence rule in Massachusetts "prohibits the introduction of extrinsic evidence to alter the terms of an integrated and complete written contract."   *Hallmark Inst. of Photography, Inc*. v. *CollegeBound Network, LLC*, 518 F. Supp. 2d 328, 331 (D. Mass. 2007) (citing *Cambridgeport Sav. Bank* v. *Boersner*, 597 N.E.2d 1017, 1020 (Mass. 1992)).   Despite the presence of an integration clause in the employment agreement, suggesting that it represents the entirety of the parties' agreement, embodied in the agreement is the suggestion that when the dispute with Mohamed is resolved, the parties may revisit the question of membership.   Nothing in the integration clause explicitly precludes the possibility of some promise based on this condition precedent; nor does the parol evidence rule serve to exclude earlier conversations where they would not necessarily modify the provisions of the employment agreement, but rather serve to trigger a series of revisions to obtain the result promised.   *See Kennedy Bros., Inc*. v. *Bird*, 192 N.E. 73, 76 (Mass. 1934) ("Previous negotiations may clarify the sense in which expressions were understood by the parties."); *see also Mass. Mun. Wholesale Elec. Co*. v. *Town of Danvers*, 577 N.E.2d 283, 288 (Mass. 1991) ("When construing a contract, a court looks to the parties' intent to determine whether they have created a condition precedent.").

Selfridge has not created a genuine issue of material fact, however, that would allow a reasonable fact finder to conclude that she indeed had an oral agreement to become a member with the persons who would need to provide consent for her membership.  The addition of a new member, under the terms of the operating agreement, requires the written consent of all existing members.  Although Selfridge contends that she, Jama, Murray, Anderson, and Perez agreed that she and the other women would become members when the Mohamed dispute was resolved, she does not allege that she had any conversation or agreement with Hassan, one of the existing members, to confer membership.[22] Leaving aside Mohamed, on the assumption that he is no longer a member, Selfridge has not alleged that she had an oral agreement with the individuals - Jama and Hassan - capable of conferring membership.

Even if Selfridge did allege that she had conversations with Jama and Hassan in which both promised to make Selfridge a member, Selfridge would have only an agreement to agree.  An

---

[22] Selfridge instead states in her affidavit that "Abdulle never objected" and that "he also agreed to the proposal made by Mr. Jama."  She argues that Abdulle acted on behalf of his wife, Barlin Hassan, and therefore his agreement to the proposed membership serves to bind Hassan.  But Selfridge does not allege anywhere in her affidavit or in other evidentiary materials that Abdulle acted on behalf of Hassan, and presents this allegation only in argument.  This is inadequate to create an issue of material fact at summary judgment.

agreement to agree, standing alone, does not create an enforceable contract. *See Laudano* v. *214 South Street Corp.*, 608 F. Supp. 2d 185, 194 (D. Mass. 2009); *Cousin* v. *Sofono, Inc.*, Civ No. 01-30186-MAP, 2003 WL 22391233, at *6 (D. Mass. Oct. 17, 2004) (citing *Rosenfield*, 195 N.E. at 325-26). Selfridge has not alleged that the parties agreed on certain essential terms of her membership, including her initial capital contribution and sharing ratio. *See Laudano*, 608 F. Supp. 2d at 194-95 ("An alleged oral contract is unenforceable if it is silent on 'essential terms.'" (quoting *Held* v. *Zamparelli*, 431 N.E.2d 961, 962 (Mass. App. Ct. 1982)). As there is no enforceable agreement to confer membership on Selfridge, I will grant summary judgment for the defendants on this count.

**B.  *Common Law Claims***

   1.   Breach of Fiduciary Duty (Count II)

   Selfridge alleges that the individual defendants acted as co-owners of Boston Home Health, and that each owed the other a fiduciary duty of loyalty and good faith.  She further contends that these defendants breached their duties by terminating her, making "baseless threats," withholding compensation, attempting to freeze her out of the company, and refusing to acknowledge her interest in the company."

Selfridge and the individual defendants were not co-owners of Boston Home Health together and did not owe each other duties in that respect.  Instead, Selfridge was an at-will employee, because her employment agreement did not specify a definite period of employment, and her employment was "terminable . . . without notice, for almost any reason or for no reason at all." *Jackson* v. *Action for Boston Cmty. Dev., Inc.*, 525 N.E.2d 411, 412 (Mass. 1988).  However, such termination must comport with the covenant of good faith and fair dealing implied in at-will employment contracts in Massachusetts, which requires that a party deal "honestly and in good faith in both the performance and enforcement of the terms of [the] contract." *Hawthorne's, Inc.* v. *Warrenton Realty, Inc.*, 606 N.E.2d 908, 914 (Mass. 1993); *see Kravetz* v. *Merchants Distribs., Inc.*, 440 N.E.2d 1278, 1280 (Mass. 1982) (citing *Gram* v. *Liberty Mut. Ins. Co.*, 429 N.E.2d 21 (Mass. 1981); *Fortune* v. *Nat'l Cash Register Co.*, 364 N.E.2d 1251 (Mass. 1977)).  Under the *Fortune* doctrine, "an employer is accountable to a discharged employee for unpaid compensation if the employee [is] terminated in bad faith and the compensation is clearly connected to work already performed." *Harrison* v. *NetCentric Corp.*, 744 N.E.2d 622, 629 (Mass. 2001).

The defendants contend that they had numerous, good faith reasons for terminating Selfridge.  These reasons were explained at length by Murray and Anderson in their depositions, and one basis — that Selfridge barely attended work while she was enrolled in a full-time clinical unit for her master's degree — was supported by Selfridge's own testimony.

Selfridge has not presented any genuine issues of material fact that, if resolved in her favor, could allow a factfinder to conclude that the defendants acted in bad faith in discharging her.  She offers only the conclusory allegations in her complaint and her assertion that adverse inferences should be drawn from Jama's complete silence in his deposition.  But such inferences cannot be the sole basis for rebutting the evidence offered by the defendants.  *See Unum Group* v. *Benefit P'ship, Inc.*, 938 F. Supp. 2d 177, 184 (D. Mass. 2013).  Selfridge also fails to point to any evidence of threatening conduct by any of the individual defendants.  Recognizing that Selfridge has other avenues for obtaining relief for unpaid compensation through her Wage Act claim, I will grant summary judgment for the defendants on this count.

### 2.   Breach of Contract (Count V)

Selfridge asserts that the defendants breached the terms of the employment agreement in (1) purporting to terminate

Selfridge's employment for "adequate cause" without complying with the requirements for doing so in the agreement and (2) regardless of the basis for her termination, failing to pay her either ongoing incentive payments or a termination payment, as required by the terms of the agreement.  A plaintiff alleging breach of contract under Massachusetts law must demonstrate that the parties entered into a valid agreement; the plaintiff was ready, willing, and able to perform under the agreement; the defendant breached the agreement; and the plaintiff sustained damages as a result of the breach.  *Singarella* v. *City of Boston*, 173 N.E.2d 290, 291 (Mass. 1961); *see Michelson* v. *Digital Fin. Servs.*, 167 F.3d 715, 720 (1st Cir. 1999).  The parties' dispute focuses on whether the defendants indeed breached the agreement, based on their differing interpretations of what the agreement requires.

In interpreting the terms of the governing contract, there is a factual issue for a jury to decide if the language is ambiguous, such that the terms are facially inconsistent or "reasonably susceptible to multiple, plausible interpretations." *Nault* v. *United States*, 517 F.3d 2, 4 (1st Cir. 2008); *see Children's Hosp. Corp.* v. *George Washington Univ.*, 750 F. Supp. 2d 239, 245 (D. Mass. 2010) (citations omitted).  An unambiguous contract, on the other hand, must be enforced according to its

38

plain terms. *Smart* v. *Gillette Co. Long Term Disability Plan*, 70 F.3d 173, 176-79 (1st Cir. 1995). A party has breached a contract if it has failed to perform, under the plain terms of the contract, and lacks a legal excuse for doing so. *See Realty Developing Co.* v. *Wakefield Ready-Mixed Concrete Co.*, 100 N.E.2d 28, 30 (Mass. 1951).

### a. Basis for Selfridge's Termination

As noted above, where an employment contract does not specify the duration of employment, an employee is considered to be at-will and may be terminated with or without cause at any time.[23] *See Jackson*, 525 N.E.2d at 412. Under the terms of the employment agreement, the basis for termination dictates the form of compensation received by the departing employee. When the employee is terminated by the company for "adequate cause" or at the voluntary election of the employee, the company selects the compensation option as between two choices: an ongoing incentive payment or a termination payment. When an employee is terminated without adequate cause, however, the

---

[23] Selfridge asserts in a footnote that she could not be terminated at all, because Jama failed to consult with her prior to her termination, as required by ¶ 1 of the employment agreement vesting management responsibilities jointly in Jama and Selfridge. Although she states that she "is not pursuing this argument [at] this time," I note that the employment agreement could not be read to guarantee Selfridge continued employment at the company.

employee selects the compensation option.  Selfridge asserts that she was terminated without cause and therefore her termination should be governed by ¶ 8 of the agreement, allowing her to elect a compensation mechanism, whereas the defendants contend that ¶ 6 governs her termination and places the compensation election in their hands.

"Adequate cause" has a specific definition in the employment agreement as: "(i) fraud, embezzlement, or other intentional misappropriation by the Employee from the Company; (ii) conviction of the Employee of a felony or a misdemeanor involving moral turpitude; or (iii) conduct by the Employee involving gross negligence, willful misconduct or other action which materially damages the reputation or business of the Company."  The agreement also states that "[t]he existence of Adequate Cause shall be determined by unanimous vote of the remaining Employees of the Company."  Termination for adequate cause under the agreement thus requires fulfillment of two elements: (1) qualifying conduct and (2) termination approval by all remaining employees.

There is credible evidence that Selfridge engaged in conduct involving gross negligence or willful misconduct, namely her allegedly fraudulent or simply rushed completion and submission of therapy visit notes to MassHealth for

reimbursement.  Taking Murray's allegations as true, this
conduct materially damaged the business of Boston Home Health by
requiring it to return $10,000 worth of payments to Mass Health.
However, Selfridge's assertions that Murray misunderstood her
visit notes and that she did not engage in inappropriate
behavior arguably create a material dispute on this issue, where
the language of the contract appears to require actual
misconduct rather than merely perceived misconduct.

Even assuming that there is no dispute that Selfridge
engaged in conduct meriting termination for cause, the
defendants have not presented any evidence that the second
requirement has been satisfied.  Although a reasonable inference
could be made from the testimony of Murray and Anderson that
they supported the decision to terminate Selfridge, the
employment agreement clearly requires a unanimous vote of all
remaining employees to support a determination of adequate
cause.[24]  Accordingly, there is a genuine dispute whether
Selfridge was terminated for adequate cause or not.

---

[24] Contrary to Selfridge's assertion, the employment agreement
does not require that this vote be in writing; however, some
evidence that a vote occurred and that it was unanimous is
necessary.

b. *Selfridge's Entitlement to Incentive Payments*

If Selfridge was not terminated for adequate cause, she would have been entitled to choose between receiving ongoing incentive payments and receiving a one-time termination payment; if she was terminated with adequate cause, Boston Home Health would still have been obligated to pay her one of these forms of payment upon discharge.  The defendants assert that whether Selfridge could have selected the payment is irrelevant, because she would not have received anything under either option. Boston Home Health had not been making incentive payments at the time of Selfridge's termination, and therefore her incentive payment upon discharge and continuing into the future would be zero.  Similarly, because termination payments are contingent on the amount of the incentive payment, her termination payment would also have been zero.  Accordingly, the defendants ask for summary judgment in their favor on this count, because regardless of the basis for Selfridge's termination, she is not owed any additional compensation than what she has received.[25]

---

[25] The defendants also assert that Selfridge's claim for incentive payments is belated, as it was not raised in her complaint, her deposition, or her sworn answers to interrogatories.  They read the complaint as hinging on the plaintiffs' ownership claim and therefore contend that the absence of the terms "incentive payment" and "termination payment" from her complaint preclude her from raising these claims.  Her complaint is not so limited, however.  In her

Selfridge recognizes that the employment agreement provides for payment of incentive payments at the discretion of the officers based on "the financial condition of the Company," and therefore that there could be times when no incentive payment is made, but emphasizes that the phrase, "'Incentive Payments' shall be made" means that the incentive payments are not discretionary.  When the company is in a financial position to make such payments, Selfridge contends, they must be paid. Selfridge does not dispute, however, that neither she nor any of the individual defendants received an incentive payment during her time at Boston Home Health because the company was not in a position to provide them.  Instead, Selfridge asserts that because Murray received an incentive payment in 2013, she is entitled to receive the same payment as well.

The parties have identified an ambiguity in the language of the agreement on its face: whether the incentive payment

breach of contract claim, Selfridge asserts that the defendants breached the employment contract they had with her, and that she is entitled to damages for that breach.  Because incentive and termination payments are explicitly provided for in the employment agreement, a claim for them is implied in her general breach of contract claim.  In addition, Selfridge clearly contemplated these types of payments in her answers to the interrogatories, where she indicated that she sought damages of more than $350,000 in lost income, but that "[t]his amount continues to increase."  Although Selfridge did not provide the calculation methodology, as requested, this $350,000 figure corresponds with her later assessment of the incentive payments allegedly received by Murray.

obligation (and correspondingly the termination payment obligation) is determined at the time of termination, as the defendants contend, or whether it imposes an ongoing obligation on the company to make incentive payments to a former employee at such time in the future as the company becomes able to pay them to existing employees, even if it made no such payments during the former employee's tenure at the company, as Selfridge contends. Where there are multiple interpretations of contractual language, there is a jury question only to the extent that those interpretations are reasonable and plausible. *See Nault*, 517 F.3d at 4; *see also Fashion House, Inc*. v. *K mart Corp.*, 892 F.2d 1076, 1085 (1st Cir. 1989) (court must interpret contract using "readily ascertainable meaning" that "reasonable person, reading the document as a whole and in a realistic context," would give terms).

The proffer of some possible interpretation of the contractual language, however, is not enough to survive summary judgment. Rather, it must be one "that will give effect to the chief design to be accomplished by [the contract]." *Mass*. *Mun. Wholesale*, 577 N.E.2d at 294. Selfridge's reading of the employment agreement, although drawn from the plain terms of the agreement, is not a reasonable or plausible one.

44

The employment agreement is expressly that — an at-will employment contract — that does not confer any sort of ownership or ongoing membership in the company beyond employment.  To say that the incentive payment obligation is dynamic and defined by the incentive payments actually made over the course of the continued life of the company is to transform an agreement governing at-will employment into an agreement to provide a lifetime annuity, re-calculable each time the performance of the current employees results in a measurable financial gain for the company.  Surely a reasonable employee would not understand an employment agreement to afford such a benefit.  *Cf. Metropolitan Prop. & Cas. Ins. Co. v. Morrison*, 951 N.E.2d 662, 671 (Mass. 2011) (construing an insurance contract just as "any other contract" and "consider[ing] what an objectively reasonable insured, reading the relevant policy language, would expect to be covered" (internal quotation marks and citations omitted)).  Instead, the agreement is clearly designed to provide some sort of severance payment for terminated employees, albeit through a complicated arrangement of mechanisms, based on their service at the end of their relationship with the company.

This interpretation is supported by the use of the term "incentive" to define these payments.  "A contract should be construed in such a way that no word or phrase is made

45

meaningless by interpreting another word or phrase, because the interpretation should favor a valid and enforceable contract . . . ."  *Lexington Ins. Co.* v. *All Regions Chemical Labs, Inc.*, 647 N.E.2d 399, 400 (Mass. 1995); *see Edmund Wright Ginsburg Corp.* v. *C.D. Kepner Leather Co.*, 59 N.E.2d 253, 257 (Mass. 1945).  An "incentive payment" by name and purpose is designed to motivate employees to perform at a high level to ensure the success of the company and correspondingly to reap the rewards of that success.  *See* Webster's Third New International Dictionary 1141 (1986) (defining "incentive" as "something that incites or has a tendency to incite to determination or action").  It would be perverse to require a company to provide increased incentive payments to former employees who are no longer contributing to the success of the company.  This reading is not inconsistent with providing "*ongoing* incentive payments," where ongoing can — and here, only reasonably may — be interpreted to mean the continued *provision* rather than continuous *recalculation*.  A reading of the agreement as a whole thus demonstrates that ongoing incentive payments are to be made only to the extent that such payments were made at the time of termination.  *See De Freitas* v. *Cote*, 174 N.E.2d 371, 373 (Mass. 1961) (words of contract are to be given "their plain and ordinary meaning in the light of the

circumstances and in view of the subject matter" (citations omitted)); *Rubin* v. *Murray*, 943 N.E.2d 949, 960 (Mass. App. Ct. 2011) ("objective is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose" (internal quotation marks and citations omitted)).

That the valuation of incentive payments owed to an employee over time is based on the value of any such payments made at the time of the employee's termination is consistent with the language governing termination payments in the agreement.  Under ¶ 7 of the agreement, the termination payment is calculated based on "the reasonable present fair market value of the Employee's rights to receive Incentive Payments."  Under ¶ 8, when an employee is terminated without adequate cause, the company must pay the termination payment, if elected by the discharged employee, "within thirty (30) days after the effective date of termination."  In order to give effect to the 30-day payment requirement under ¶ 8, "present" under ¶ 7 must mean at the time of termination or as of "the effective date of termination."  Even though ¶ 8 is in some ways a more specific provision than ¶ 7, it can "control the meaning of [the] more general provision of the same subject," *Kolbe* v. *BAC Home Loans Servicing, LP*, 738 F.3d 432, 445 n.13 (1st Cir. 2013),

particularly if doing so permits the provisions to be interpreted consistently with one another such that all of the terms of the contract are given effect.  *See Blackie* v. *State of Me.*, 75 F.3d 716, 722 (1st Cir. 1996).

The operation of paragraphs 7 and 8 together, and their reflection upon the meaning of the entire agreement, permit only one reasonable interpretation: that the time of termination is the determinative temporal point on which the incentive and termination payments are based.  Because the only reasonable reading of the employment agreement is the calculation of an incentive payment (and a corresponding termination payment) at the time of termination, rather than at some point in the future, there is no basis on which Selfridge could be entitled to either type of payment, since no incentive payments were made during her tenure at Boston Home Health.  Accordingly, I will grant the defendants' motion for summary judgment and deny Selfridge's cross-motion for summary judgment on this count.

### 3.   Infliction of Emotional Distress

Selfridge alleges that the defendants engaged in "intentional and outrageous acts which they knew would cause extreme emotional distress."  She asserts that she was terminated without cause, by surprise, and not in compliance with the procedures required for termination under the

employment agreement, and that the defendants "engaged in vindictive and demeaning conduct which included the non-payment of wages to Selfridge and meritless threats only to prevent her from filing this action." In her subsequent filings, she asserts that she has suffered loss of sleep, anxiety, and depression as a result of these events, and states that she talked about her emotional distress with a nurse-practitioner but did not enter into any formal therapy. In light of these claims, she seeks damages for both negligent and intentional infliction of emotional distress. The defendants assert that Selfridge's emotional distress claims are "hollow" and that she has not met the requisite showing for these claims.

### a. Negligent Infliction (Count III)

A claim of negligent infliction of emotional distress in Massachusetts requires satisfaction of five elements: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Payton* v. *Abbott Labs*, 437 N.E.2d 171, 181 (Mass. 1982). Physical harm has taken on a broader significance since *Payton*; plaintiffs pursuing such a claim "must corroborate their mental distress claims with enough objective evidence of harm to convince a judge that their claims

present a sufficient likelihood of genuineness to go to trial." *Sullivan* v. *Boston Gas Co.*, 605 N.E.2d 805, 810 (Mass. 1993).

Pulling the facts necessary to satisfy each element of this claim from Selfridge's complaint and evidentiary materials is challenging, but not wholly unsuccessful. Nowhere does she pinpoint the alleged negligence resulting in her emotional distress, although one might infer that her claims that the defendants wrongly accused her of falsifying therapy visit notes and failed to consult the employment agreement before terminating is the basis for her negligence claim. Selfridge has demonstrated the possibility of emotional distress and resulting symptoms. Indeed, symptoms similar to those Selfridge alleges have been deemed sufficient to survive a motion for summary judgment in other cases. *See, e.g.*, *Kelly* v. *Brigham & Women's Hosp.*, 745 N.E.2d 969, 976-77 (Mass. App. Ct. 2001) (plaintiff's own testimony of "cramps, shortness of breath, and nightmares" was sufficient emotional distress to survive defendants' motion for summary judgment); *Bresnahan* v. *Mcauliffe*, 712 N.E.2d 1173, 1177-78 (Mass. App. Ct. 1999) (anxiety, depression, and anger are adequate symptoms). *Contrast Gutierrez* v. *Mass. Bay Transp. Auth.*, 772 N.E.2d 552, 566-67 (Mass. 2002) (tears alone are not adequate "objective manifestation" of emotional distress).

The remaining elements — causation and whether a reasonable person would experience such distress — are undoubtedly questions for a jury, and the defendants have not shown that there are no facts on which a jury could find in Selfridge's favor on these elements. *See Payton*, 437 N.E.2d at 184 (noting the difficulty of proving causation in this context). Where, as discussed above, there are genuine disputes of material fact whether the defendants properly terminated Selfridge and regarding the bases for her termination, and where all reasonable inferences are to be made in favor of the non-moving party, a reasonable jury could find that Selfridge has demonstrated negligent infliction of emotional distress sufficiently to survive summary judgment. *Cf. Gardner* v. *Simpson Financing Ltd. P'ship*, 963 F. Supp. 2d 72, 83 (D. Mass. 2013) (jury is entitled to credit potentially self-serving testimony by plaintiffs of symptoms relevant to emotional distress claim). Accordingly, I will deny the defendants' motion on this count.

    *b. Intentional Infliction (Count IV)*

Selfridge's claim of intentional infliction of emotional distress cannot survive summary judgment. A claim of intentional infliction of emotional distress in Massachusetts requires satisfaction of three elements: "(1) that the actor

51

intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and 'was utterly intolerable in a civilized community;' (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was 'severe' and of a nature 'that no reasonable [person] could be expected to endure it.'" *Agis* v. *Howard Johnson Co.*, 355 N.E.2d 315, 318-19 (Mass. 1976) (internal citation omitted). The conduct must be more than "'mere insults, indignities, threats, annoyances, petty oppressions or other trivialities' nor even is it enough 'that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" *Tetrault* v. *Mahoney, Hawkes & Goldings*, 681 N.E.2d 1189, 1197 (Mass. 1997).

Whether the "extreme and outrageous" conduct element is satisfied "can be decided by the court" through assessment of "the extent and nature of the defendant's conduct." *McCarty* v. *Verizon New Eng., Inc.*, 731 F. Supp. 2d 123, 130 (D. Mass. 2010)

(quoting *Caputo* v. *Boston Edison Co.*, 924 F.2d 11, 14 (1st Cir. 1991)).  Without belittling Selfridge's disputes with the individual defendants and Boston Home Health, it cannot be said that those interactions rose to the level of "extreme and outrageous conduct."  Selfridge's allegations leave much to the imagination of what specific behaviors the defendants engaged in that could fit this bill, but she has made no indication that they rise to the level of conduct typically recognized as "extreme and outrageous."  *Compare Kibbe* v. *Potter*, 196 F. Supp. 2d 48, 72 (D. Mass. 2002) ("frequent instances" of lewd sexual conduct and insinuation, "if proven, would allow, albeit not require, a reasonable jury to conclude that [the] conduct was extreme and outrageous"), *with Richey* v. *American Auto. Ass'n, Inc.*, 406 N.E.2d 675, 678 (Mass. 1980) (dismissal of employee as "a bad, unjust, and unkind decision" is not "extreme and outrageous conduct," and collecting cases).  Accordingly, I will grant summary judgment for the defendants on the intentional infliction of emotional distress claim.

**C.  *Statutory Wage Claims***

1.  Violation of the Fair Labor Standards Act (Count VI)

The defendants assert that they are entitled to summary judgment on Selfridge's claim of a violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.*, because

Selfridge has admitted that Boston Home Health did not pay overtime during her tenure there, and because Selfridge met the administrative exemption of the FLSA.

The FLSA, in general terms, requires that an employee be paid a minimum hourly wage and overtime compensation if he or she works in excess of forty hours in a work week.  29 U.S.C. §§ 206, 207.  Certain employees are exempt from these requirements, including those who are "employed in a bona fide executive, administrative, or professional capacity."  *Id.* § 213(a)(1).  The Department of Labor has defined such an employee as one who is "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week . . . ; (2) [w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a) (2014).  The employer bears the burden of demonstrating that a particular employee falls within the exemption.  *Hines* v. *State Room, Inc.*, 665 F.3d 235, 240 (1st Cir. 2011).  As Judge Stearns recently observed, "[w]hether an exemption applies implicates questions of both fact and law. The question of how an employee spends her time is factual,

while the issue of whether the nature of her work renders her exempt from the FLSA's overtime requirement is a question of law." *DiBlasi* v. *Liberty Mut. Group, Inc.*, Civ. No. 12-10967-RGS, 2014 WL 1331056, at *6 (D. Mass. Apr. 3, 2014) (citations omitted).

The first element is clearly satisfied because Selfridge earned a salary of $2,000 per week.  The defendants demonstrate that the second element is satisfied through reference to Selfridge's own description of her responsibilities, which included meeting with doctors, doing payroll, keeping employment records, collaborating with vendors, inputting data, performing administrative tasks, and only occasionally seeing patients. The third element is satisfied through reasonable inferences that these tasks involve the exercise of discretion, as well as the express investiture of Selfridge with management authority by the employment agreement.  The defendants accordingly have demonstrated that no reasonable juror could find that Selfridge did not fall within the administrative exemption to the FLSA.

Selfridge's opposition to the defendants' summary judgment motion focuses primarily on her assertion that the employment agreement explicitly contemplated the payment of overtime wages, followed by a series of adverse inferences she seeks to draw from Jama's invocation of his Fifth Amendment privilege.

55

Specifically, she asserts that the decision of whether overtime compensation was payable was at Jama's discretion, that he could have determined that Selfridge was entitled to overtime compensation, and that an adverse inference should be drawn that he would have elected to pay her overtime.  Even if these inferences were permissible, this would be the basis for a contractual claim, but not a statutory one.  However, as the defendants emphasize, this chain of inferences is rebutted by Selfridge's clear statement that overtime compensation was not provided while she was a manager at Boston Home Health and tasked with making such decisions – a statement corroborated by Murray and Perez.[26]  Absent any independent evidence supporting her suggestion that Jama would have paid her overtime, a reasonable jury could not find in Selfridge's favor.  *See Unum Group*, 938 F. Supp. 2d at 184.  Accordingly, I will grant summary judgment for the defendants on this count.

### 2.   Violation of the Massachusetts Wage Act (Count VII)

Finally, Selfridge raises a claim for unpaid compensation under the Massachusetts Wage Act.  *See* Mass. Gen. Laws ch. 149, §§ 148, 150.  "Section 148 of the Wage Act requires prompt and full payment of wages due" and prohibits "special contracts"

---

[26] Selfridge's eligibility for overtime compensation is also undermined by the testimony of Murray and Selfridge herself that at times she worked only ten hours a week or less.

that aim to thwart the requirements of the Wage Act.  *Camara* v.
*Attorney Gen.*, 941 N.E.2d 1118, 1120 (Mass. 2011).  Section 148
therefore "generally prohibit[s] an employer from deducting, or
withholding payment of, *any* earned wages," even where the
employee has assented to the deduction.  *Id.* at 1121 (quoting
Mass. Gen. Laws ch. 149, § 148).

Section 150 of the Wage Act recognizes several exceptions
to this general rule, including "the attachment of such wages by
trustee process or a valid assignment thereof or a valid set-off
against the same."  Mass. Gen. Laws ch. 149, § 150.  The
Massachusetts Supreme Judicial Court has defined "valid set-off"
consistent with "the common, ordinary sense to refer to
circumstances where there exists a clear and established debt
owed to the employer by the employee."  *Somers* v. *Converged*
*Access, Inc.*, 911 N.E.2d 739, 750 (Mass. 2009).  This includes
situations "where there is proof of an undisputed loan or wage
advance from the employer to the employee; a theft of the
employer's property by the employee, as established in an
'independent and unbiased proceeding' with due process
protections for the employee; or where the employee has obtained
a judgment against the employee for the value of the employer's
property."  *Camara*, 941 N.E.2d at 1124 n.13.

Selfridge alleges that the defendants have failed to pay her more than $15,000.  The defendants contend that any unpaid wages owed to her should be offset by $10,000 for the loss she caused to Boston Home Health in falsely completing therapy visit notes, and that this set-off "would exceed any award for 'back pay' she could hope to recover in 2013."[27]

As a threshold matter, neither party has offered specific calculations or supporting evidence as to the precise amount of unpaid wages, rather than other allegedly unpaid compensation, Selfridge is owed.[28]  However, Selfridge stated that there were times during her employment that she did not receive her full

---

[27] The defendants also contend that Selfridge earned more in 2014 from her other jobs than she would have at Boston Home Health, and therefore that she is not entitled to any recovery.  They do not cite any cases to support their contention that even if Selfridge could make a case for liability under the Wage Act, her claim for damages falls short of any recoverable amount, because she earned more at her other jobs.  The case law suggests that the defendants' reading of some sort of mitigation into the statute is misplaced.  In *Somers* v. *Converged Access, Inc.*, 911 N.E.2d 739, 744 (Mass. 2009), the court stated that "'damages incurred' by an individual under section 150 for having been misclassified as an independent contractor rather than an employee, in violation of section 148B . . . equal the value of wages and benefits he should have received as an employee, but did not."  The court rejected the argument that damages "should be measured by subtracting the compensation the plaintiff obtained as an independent contractor from the compensation the plaintiff would have received had he been hired as an employee."  *Id.*

[28] It is unclear whether Boston Home Health has paid Selfridge some of what she is owed, and if so what amounts remain outstanding.

wages because the company was unable to pay them.  This is enough to state a claim and identify a genuine dispute as to whether Boston Home Health improperly reduced or made deductions from her earned wages in violation of the Wage Act.

Assuming there is a basis for relief, the defendants have not demonstrated that they imposed a valid set-off equal to $10,000 under section 150, such that a reasonable juror could conclude only that Boston Home Health properly withheld these monies from Selfridge due to her conduct.  Whether circumstances involving employee misconduct or employee-induced damages to the company merit a set-off has been the subject of some confusion for Massachusetts courts.  *See Camara*, 94 N.E.2d at 1122-24 (discussing cases grappling with the issue).  In *Camara*, the Supreme Judicial Court rejected an agreement between a disposal service company and its employees that payment for damages to company trucks and third-party personal property for which an employee was at fault would be deducted from his or her wages. *Id.*  The court concluded that this did not satisfy the policy purposes of the Wage Act and the contemplated exemptions from it because "[v]alid setoffs . . . all implicitly involve some form of due process through the court system, or occur at the employee's direction and in the employee's interests." *Id.* at 1122.  The deductions at issue did not qualify as such because

the company had "not shown that any of the employees are legally
liable for damages, or that, with respect to third parties, [the
company] was legally required to make payments on an employee's
behalf by a judgment." *Id.*   The court reasoned that these
deductions were not "analogous to a setoff to correct an
employee's misappropriation of an employer's funds" that would
be valid under section 150 because the internal process employed
by the company involved "a unilateral assessment of liability as
well as amount of damages with no role for an independent
decision maker, much less a court, and, apparently, not even an
opportunity for an employee to challenge the result within the
company." *Id.* at 1122-24.   The resulting determination of
liability and deduction from wages therefore did not rise to the
level of "a clear and established debt owed to the employer by
the employee." *Id.* at 1124 (quoting *Somers*, 911 N.E.2d at 750).

The defendants point to the testimony of Murray and
Anderson as support for their suggestion that Selfridge's debt
to Boston Home Health has been established.   These women claim
that Selfridge had filled out visit forms that were required to
be completed by a certified occupational therapist, which
Selfridge was not, and that she had paid Lucey to sign the
forms.   Selfridge denies any wrongdoing and asserts that Murray
and Anderson misunderstood how the notes at issue were prepared

and "lacked any basis to determine that [she] had engaged in inappropriate behavior."

I conclude that there is a genuine issue of material fact as to whether Selfridge engaged in conduct that would establish a debt owed to her employer for the resulting losses. Further, I am skeptical whether Boston Home Health's apparently proactive withholding of wages, absent any written agreement that such deductions would be made or formal procedure to determine if Selfridge engaged in the alleged conduct, and if so, what the extent of the damages were, could be considered a valid set-off even if the underlying wrongful conduct is established. Where there was not even an internal adjudication, much less a judicial one, of Selfridge's liability to Boston Home Health, it is unlikely that the Wage Act permits the company simply to withhold what it believes is due to it from an employee's wages. Taking Selfridge's pleadings as true, and making all reasonable inferences from the evidence in her favor, I am satisfied that there is a genuine dispute for trial and will deny summary judgment on this count.

## D. *Liability of Individually Named Defendants*

The defendants contend that none of the individually named defendants may be held personally liable for any of the actions taken by Boston Home Health. Officers are ordinarily not liable

for breach of contract by the corporation, although they may be liable for tort claims. *Union Mut. Life Ins. Co.* v. *Chrysler Corp.*, 793 F.2d 1, 11 (1st Cir. 1986); *see My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 233 N.E.2d 748, 751 (Mass. 1968) ("A corporation or other person controlling a corporation and directing, or participating actively in . . . its operations may become subject to civil or criminal liability on principles of agency or of causation."). To pierce the corporate veil in Massachusetts and hold individual defendants liable, a court must consider numerous factors, including "(1) common ownership; (2) pervasive control; (3) confused intermingling of business activity assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; (12) use of the corporations in promoting fraud." *Evans* v. *Multicon Constr. Corp.*, 574 N.E.2d 395, 398 (Mass. App. Ct. 1991); *see George Hyman Const. Co.* v. *Gateman*, 16 F. Supp. 2d 129, 150 (D. Mass. 1998). On the record before me, there is no evidence that any of these factors is satisfied for any of the individually named

defendants. Indeed, Selfridge conceded as much at the hearing on this matter. Accordingly, I will grant summary judgment as to the individual defendants on all counts.

## VI. CONCLUSION

For the reasons set forth above: the defendants' motion for summary judgment (Dkt. No. 24) is GRANTED in full as to the individual defendants, and GRANTED in part (as to Counts I, II, IV, V, and VI) and DENIED in part (as to Counts III and VII), as to Boston Home Health; so much of defendants' motion for a protective order (Dkt. No. 25) as remained outstanding following the January 8, 2015 conference is GRANTED; plaintiff's cross-motion for summary judgment (Dkt. No. 29) is DENIED; plaintiff's motion to strike (Dkt. No. 30) is DENIED in part and ALLOWED in part; and defendants' motion to strike plaintiff's affidavit (Dkt. No. 34) is DENIED.

It is FURTHER ORDERED that the parties shall file on or before April 15, 2016 a joint scheduling submission outlining a proposal for bringing this case to final judgment.

/s/ Douglas P. Woodlock_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE